FILED & JUDGMENT ENTERED
Steven T. Salata

October 2 2023

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **BALLANTYNE BRANDS, LLC** | ) | Case No. 19-30083 |
| | ) | (Substantively Consolidated) |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **BALLANTYNE BRANDS, LLC** | ) | |
| Plaintiff, | ) | Adv. Proc. No. 21-03002 |
| | ) | |
| v. | ) | |
| | ) | |
| **JOHN J. WIESEHAN, JR.,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| **BALLANTYNE BRANDS, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 21-03004 |
| | ) | |
| v. | ) | |
| | ) | |
| **JUSTIN WIESEHAN,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| **BALLANTYNE BRANDS, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 21-03005 |
| | ) | |

v.                             )
                               )
**TODD MILLARD,**              )
                               )
                Defendant.     )
                               )
_____)

## MEMORANDUM OPINION

These related adversary proceedings were brought by the Liquidating Agent of the post confirmation debtor, Ballantyne Brands, LLC (the "Estate") against three former company senior executives. By consent, the actions were tried on a consolidated record.

At trial, the Estate was represented by Andrew Houston, Richard Wright and Caleb Brown of Moon, Wright and Houston. Defendants were represented by Felton Parrish of Alexander Ricks. After a detailed review of the voluminous documentary evidence presented and upon consideration of the applicable law, the Court enters this Memorandum Opinion containing Findings of Fact and Conclusions of Law. Separate Judgments will enter accordingly.

## STATEMENT OF THE CASE

By these actions, the Estate seeks to avoid and recover a total of $617,779.84 of recurrent payments (collectively, the "Transfers") made by the Debtor ("the Company")[1] to the company executives over the four years preceding its bankruptcy. The respective Defendants are former Chief Executive Officer ("CEO") and board member, John Wiesehan, Jr. ("Wiesehan"); former Chief Operating Officer ("COO") Todd Millard ("Millard"); and former Vice President of Marketing and Regulatory Affairs Justin Wiesehan ("Justin Wiesehan").

The Transfers were treated by the Company and the Defendants as payments for variable

---

[1] For to distinguish them, we refer to the post confirmation debtor as the "Estate, but term the prepetition debtor as "the Company."

compensation, tax distributions and/or consulting fees. Even so, the Estate maintains the Transfers were equity distributions, not compensation, in that they provided no value to the Debtor. But, to the extent the Transfers might be considered executive compensation, the Estate argues that compensation was excessive and, thus, still for less than "reasonably equivalent value." Finally, the Estate maintains that even if compensation, some of the Transfers were unearned and/or unauthorized by the Company's Board of Managers (the "Board").

Accordingly, the Estate seeks to avoid and recover the Transfers as actual and/or constructively fraudulent transfers under Section 548 of the Bankruptcy Code and its state law analog, the North Carolina Uniform Voidable Transactions Act, N.C. GEN. STAT. §§ 39-23.1 *et seq.*, made applicable by section 544 of the Bankruptcy Code. 11 U.S.C. § 548(a)(1); 11 U.S.C. § 544. Alternatively, the Estate seeks to recover the Transfers as unlawful equity distributions under Delaware law. DEL. CODE ANN. tit. 6 § 18-607(a). The Estate seeks $194,212.49 from Wiesehan; $250,365.50 from Millard; and $173,201.85 from Justin Wiesehan.

The Defendants counter that the Transfers were simply compensation for prepetition services, or in a few instances, reimbursement of tax obligations. They say the compensation was reasonable given their industry experience, customer relationships, their positions and their duties. The compensation was "arm's-length," in that it was set by the Company's Board of managers. And the tax distributions were debts owed by the Company to them under its Operating Agreement.[2] Thus, the Company received reasonably equivalent value in exchange for the Transfers, and they are not avoidable. The Defendants pray dismissal of all claims, with prejudice.

---

[2] There were two Operating agreements one dated November 11, 2012 ("Original Operating Agreement") and an amended operating agreement dated July 9, 2013. ("Operating Agreement"). Here we are referring to the amended operating agreement.

## PROCEDURAL BACKGROUND

On January 18, 2019 (the "Petition Date"), Ballantyne Brands, LLC, a Delaware limited liability company ("BB-DE") and Ballantyne Brands, LLC, a North Carolina limited liability Company ("BB-NC") filed Chapter 11 petitions in this Court.   A joint plan of liquidation ("the Plan") was confirmed on September 3, 2019.   The Plan substantively consolidated the two bankruptcy estates, merging their assets and liabilities into Ballantyne Brands-DE.  GreerWalker, LLP was appointed Liquidating Agent under the confirmed plan ("GreerWalker" or "Liquidating Agent").   It was given authority to collect and distribute the consolidated Estate to creditors, prosecute litigation claims, and wind up the company's operations.  Pursuant to that authority, on January 15, 2021, the Estate filed these adversary proceedings.

## FINDINGS OF FACT

### The Start Up Company.

At the outset in 2012, Defendants Wiesehan and Millard were long-time consumer products executives with substantial experience in the sale, marketing and distribution of consumer brand products to major retailers.  This included experience in the marketing and sale of electronic cigarettes, a new consumer product industry.   Hoping to capitalize on their experience and customer relationships, Wiesehan and Millard decided to start their own e-cigarette company, BB-NC ("BB-NC" or "the Company").

Realizing that this venture would require considerable capital and continued financial support, Wiesehan and Millard sought out Steel Partners Holdings, L.P. ("Steel Partners"), a multi-billion-dollar private equity firm.  As conceived, Defendants would serve as management for the new venture while Steel Partners would provide the necessary financial backing.  Their shared goal was to start, grow, and then potentially sell the new business.

In November of 2012, Wiesehan, and Millard contributed their membership interests and in turn received minority equity interests in BB-NC. The Company's other equity members consisted of three Steel Partners subsidiaries: DSC Services II, LLC; Ore Holding, Inc.; and Ore Pharmaceutical Holdings, Inc. (collectively, "Steel").

Although Wiesehan and Millard originally anticipating owning the Company, the capital needs resulted in Steel holding the majority of equity. Steel contributed about $3 million of startup capital and received 74.65% of the membership interests (93% of the voting rights[3]) in the Company. Defendants Wiesehan and Millard each contributed $100,000 to the venture, for which they received their minority interests. At the time of the Transfers, Wiesehan held 7.672% (3.34% voting) of the membership interests; Millard, 7.672% (3.34% voting); and Wiesehan's son, Justin Wiesehan 2.00% (0%).[4]

**Corporate Governance.**

*Management.* The Company was operated on a day-to-day basis by the Defendants and Wiesehan's other son, John Wiesehan, III (collectively, "Management").

*Chief Executive Officer.* As CEO, Wiesehan was responsible for all the Company's day-to-day business operations. The Company COO (Millard) and Chief Financial Officer ("CFO") reported directly to him. In addition to his overall responsibilities, Wiesehan's efforts were primarily focused on product development and retail engagement. This was a natural fit as Wiesehan had a 25-year sales relationship with Walmart. Although the Vice President of Sales handled day-to-day interactions with Walmart; given the importance of this customer, Wiesehan remained involved with the account. Much of Wiesehan's time was spent traveling in order to meet with suppliers and

---

[3] The equity interests in the Company were divided into Class A Units and Class B Units, but only Class A Units had voting rights.
[4] The remaining equity units held by management and employees were non-voting interests.

customers.

*Chief Operating Officer.*   Meanwhile, Millard was Company COO. The Company's Vice Presidents of Sales and Marketing, the Customer Service Manager, four Regional Sales Managers, and four Customer Service Representatives reported to Millard.  He was responsible for all US retail customers and internet customers, apart from Walmart.  At the end of 2016, Millard resigned as COO; however, he thereafter provided consulting services to the Company from January 2017 to September of 2017.

*Director of Marketing*.   Justin Wiesehan was the Company's Director of Marketing, Vice President of Marketing (2013 to 2015) and Vice President of Regulatory Affairs (2015 to 2017).

*The Board*.   The Company was governed by a three-person Board.  Two Board members were appointed by Steel.  The third board member, Wiesehan, was chosen by Management.  Through its ownership of over 90% of the voting interests in the Company and its ability to appoint two of the three Board members, Steel controlled overall direction of the Company.

Management provided the Board with information, and the Board met several times each year to obtain updates and authorize certain company actions.  Steel was somewhat involved with the Company's day-to-day operations through regular phone communications between Wiesehan and Steel executive, Jack Howard ("Howard").  The Company also provided monthly financial reports to Steel and the Board.

 Of relevance to this dispute, the Board annually reviewed and authorized the Company's annual budgets, including the compensation arrangements for Management.  For example, the Minutes for the Board meeting on May 17, 2016, state that the "Senior Team Bonus Program" would be discussed at the next meeting. The minutes for "Comp History/Bonus Structure" also state that no senior bonus was approved for that year.  Nevertheless, the parties disagree as to whether

Management accurately and fully informed the Board about company operations, finances, and management compensation.

*Taxation.* The Company was set up as a pass-through entity for tax purposes. As a 'pass-through,' the Company did not pay taxes. Rather, its tax attributes and liabilities "passed through" to the individual members, *pari passu* to their membership interests.

**Operational History.**

The Company began operations in 2013. Unlike some e-cigarette companies, the Company did not manufacture its own products. It purchased them largely in China.

Initially, the Company was quite successful. Within a year of beginning operations, the Company's products were being sold in 60,000 retail locations across the United States. Customers included major retailers like Walmart, Dollar General, and Circle K. By 2016, the Company's "Mistic" brand was one of the major e-cigarette brands in the industry, competing with products like NJOY, Blu, and Logic.

However, this rapid sales growth came at a price. The Debtor experienced financial hardship and challenges almost from the start. These hardships were occasioned by a number of factors: a lack of capital; poor accounting practices and financial reporting; increasing competition in the marketplace; increasing product returns; unprofitable operations; government regulation of Company products (with associated compliance costs); poor communications between Management and the Board; and—as we will see—excessive compensation of Management.

*Changes in the E-Cigarette Industry and Unprofitable Operations.* At the time the Company was founded, the market for e-cigarettes was just developing. A 2016 government report described the e-cigarette market as "a rapidly emerging and diversified product class" and

further noted that "[t]otal sales of e-cigarettes in tracked retail channels have surged exponentially since 2010."[5]    Reflecting that industry growth industry, in 2013 the Company reported net sales of almost $27 million and net income of just under $3.8 million.  However, that profitability was short lived.  The next year, 2014, the Company lost $1.8 million on sales of $30 million.[6]  By 2015, other competitors, including large tobacco companies, had entered the e-cigarette marketplace.  The Debtor's sales reflected the increased competition, declining to a paltry $16.2 million.  Not surprisingly, the Company sustained a net loss of $9.7 million.

The Defendants insist the Company's financial performance greatly improved in 2016. Management (essentially, the Defendants) reported net income to the Board of $5.5 million on sales of $27.6 million.   However, these reported figures were not accurate: liabilities and expenses were significantly understated.   Notably in late December 2016, Management reclassified and removed from the financial statements a $4.9 million Walmart customer expense item.  Thus, income was commensurately overstated.  The evidence suggests another net loss for the year.  At best, the Company operated at a breakeven level in 2016.

Adding to its financial woes, the Company's level of product discounts and sales returns (as a percentage of sales) greatly increased as time passed, growing from 8.10% in 2013 to 74.68% in 2017.  Most of these sales declines and discounts occurred during the years in which the Transfers were made to the Defendants.

*Lack of Capital.*   As a startup, all concerned recognized that the Company would need large sums of capital to support operations, needed marketing expenses, and to obtain FDA

---

[5] *See* U.S. DEPT. OF HEALTH AND HUMAN SERVICES, E-CIGARETTE USE AMONG YOUTH AND YOUNG ADULTS: A REPORT OF THE SURGEON GENERAL at 149 (2016) (available at https://www.cdc.gov/tobacco/sgr/e-cigarettes/index.htm) (the "Surgeon General Report").
[6] Defendants ascribe the 2014 losses to increased marketing expenses including an ill-advised decision to sponsor an Indy race car.  That "one off" sponsorship endeavor certainly contributed to the Company's financial woes. However, the other named factors were also at play.  And even if the sponsorship decision was at fault, a loss is a loss.  This was a large loss which the company could not afford.

approval of its products.[7]  However, operating capital was always in short supply.  In mid-2013,

Steel recouped its initial capital contribution of $3 million in an equity distribution.  Wiesehan

and Millard, recouped their respective $100,000 initial capital contributions.  And as the

Company was losing money, this left the its survival dependent on Steel making its member

loans,[8] and frankly, by the Company not paying all its creditors.

*Insolvency*.  Member's equity (and book insolvency) reflected the Company's lack of

capital and its poor operating results.  After 2013, the Debtor's liabilities always exceeded

assets.  The first of the Transfers occurred in April of 2015.  In the preceding quarter, the

Debtor's financial statements showed a members' equity of ($1,880,935).  This book insolvency

figure grew steadily until, it stood at ($17.8 million) in 2018.  Meaning, at all times during the

Transfer years, the Company's liabilities exceeded the value of its assets.  The Debtor was

consistently and increasingly insolvent.

Even if the Defendants were correct in their assertions that the Company made money in

2016, those earnings did not render the Company solvent.  By that point, the Company's equity

position was almost ($4 million).  Things were so bad that in April 2016, the Company's outside

auditors threatened to issue a qualified audit report declaring that the Company was <u>not</u> a going

concern.  To avert such a fatal report, it was necessary for a Steel entity—DCS Services II,

LLC—to reassure the auditors in writing that it had "the current positive intention and ability to

provide such funds as are reasonably expected to be necessary to enable the Company to

continue in operation for a period of at least 13 months…"[9]

Things only got worse.  Audited operating results for 2017 aren't available because the

---

[7] Wiesehan indicated in a 2012 estimate the cost of obtaining this approval was at $20 million.
[8] The first of these was made in February 2015 in the sum of $1 million.  By the petition date, $7.5 million was owing on these loans.
[9] Which, not coincidentally, extended just beyond the next financial reporting period.

Company failed to pay its auditors.  Despite Defendant assertions, the 2017 report would have shown the Company to be in the red; the Company's liabilities continued to grow while the Company continued to experience negative net income.   Declaration of William A. Barbee, 21-03002, Doc. 70, Ex. A.  And in 2018, Debtor's sales revenues were a mere $3.4 million—10% of what they were in 2014, the Company's first year in business.[10]

*The 2017 Strategic Plan.*  Annually, the Board would hold a meeting to evaluate and approve a company strategic plan for the upcoming year.  Steel required such plans for each of its portfolio companies.  The strategic plans were prepared by Management and then presented to the Board for approval.  The strategic plans were an amalgamation of corporate goals, prospective actions, and projections of future financial performance.  The strategic plans were not typically based upon audited financial information or appraised property values.

At a Board meeting held on January 18, 2017, barely two weeks after Management reversed the Walmart slotting fee transactions, Management presented the Board with the Ballantyne Brands 2017 Strategic Plan ("the 2017 Strategic Plan").

There was a lot of "fluff and puff" in the 2017 Strategic Plan. Despite its awareness of the overstatement of 2016 Net Income due to the underestimated expenses discount and product return liabilities,[11] Management projected the net 2017 revenues of approximately $30.2 million and net income of approximately $1.9 million.[12]

*FDA Compliance Problems.*

---

[10] Obviously, the 2018 sales declines occurred after the Defendants were fired in September 2017.  Some portion of those declines relate to Steel ending retail marketing in favor of online sales.  However, this is not the precipitating cause for those declines, as Defendants suggest.  With possible the exception of 2016, sales had been declining since 2014.

[11] *See* Barbee Report at 11.

[12] This figure included the planned FDA compliance costs, as discussed below in Section I(d).

On May 5, 2016, the FDA announced the so-called "Deeming Rule."[13] Under the Deeming Rule, manufacturers of e-cigarettes were required to obtain pre-market authorization for their products.

The Deeming Rule provided three different methods by which manufacturers could obtain this authorization. Depending on the method followed, a company had anywhere from 24 months to 36 months to obtain approval for its products.[14] If not obtained, those products would be subject to FDA enforcement. Given the August 2016 effective date for the Deeming Rule, the Company had an outside date of August 2019 to obtain FDA approval.[15]

The Company and its Board anticipated that obtaining FDA approval would be expensive. Specifically, the 2107 Strategic Plan estimated a cost of $5-7 million to obtain FDA marketing approval for all the Company's products.[16]

Given this, it is not surprising that the 2017 Strategic Plan contemplated exit strategies for equity. Management estimated the Company to be worth $25 million to $30 million in a short-term sale (12 months), $55.5 million in a mid-term sale (12-24 months), and $135 million in a long term (post-FDA approval).

---

[13] The Deeming Rule received its moniker from the full title of the rule: "Deeming Tobacco Products to Be Subject to the Federal Food, Drug, and Cosmetic Act." 81 Fed. Reg. 28974 (May 10, 2016). The Deeming Rule was adopted pursuant to the Family Smoking Prevention and Tobacco Control Act, Pub. L. 111-31, 123 Stat. 1776 (2009), that had amended the Federal Food, Drug and Cosmetic Act to (i) grant the FDA immediate authority to regulate cigarettes, cigarette tobacco, and smokeless tobacco and (ii) grant the FDA authority to deem other types of tobacco products as subject to FDA regulation. 21 U.S.C. § 387a(b).

[14] *See* 81 Fed. Reg. 28973, 28978.

[15] The Deeming Rule was the subject of litigation, and the initial compliance deadlines were subsequently delayed. The deadline to submit applications was ultimately extended to September 9, 2020. If an application was submitted by that deadline, the product could stay on the market for up to 12 months while the FDA considered the application. *See* Mitch Zeller, Perspective: FDA's Progress on Review of Tobacco Product Applications Submitted by the Sept. 9, 2020 Deadline, U.S. Food & Drug Admin. (Feb. 16, 2021) https://www.fda.gov/tobacco-products/ctp-newsroom/perspective-fdas-progress-review-tobacco-product-applications-submitted-sept-9-2020-deadline.

[16]The Company would also join industry lobbying efforts that sought to grandfather products on the market prior to August 8, 2016 (the effective date for the Deeming Rule) from the impact of the Rule. If grandfathered, the result would be lower expenditures for 2017.

These projections would prove to be hopelessly optimistic.  Early on, in April 2015, the Company retained an investment banker to market the business.  Several parties expressed interest, but no binding offers were received at any price point.

More importantly, the valuation estimates from the 2017 Strategic Plan ignored a vital truth that was actually stated elsewhere in that document: the Company had "restricted working capital." It is unclear whether Management simply assumed Steel, which had already made several member loans to the Company, would also fund these compliance costs.  However, the implication in the 2017 Strategic Plan is that the Company intended to do so itself.  That assumption was entirely unrealistic.  The Company lacked the necessary financial resources.

*The Board Decides Not to Pursue FDA Approval.*  Later during that first quarter of 2017, and with the Company facing dire financial circumstances and stiff marketplace competition, the Board determined not to incur the costs necessary to obtain FDA compliance.  Defendants partially attribute the Company's demise to that decision.  According to them, as customers learned that the Company would not be seeking FDA approval, customer orders and Company revenues declined. But even at those reduced sales figures, Defendants claim the Company was profitable during the first half of 2017.  It was their termination in September 2017 that sealed the Company's fate. Both assertions are rejected, as they ignore the dire financial predicament the Company was already in.

## **Termination of Management.**

Frustrated with the performance of the company and the inaccuracy of the financial reporting, in early September 2017, the Board terminated the Defendants for cause.[17]  This event effectively ended retail sales to the big box stores.  Thereafter, the Company sold its products

---

[17] No stated reason was given by the Board.

online.  The Company struggled on for eighteen months until it filed bankruptcy in January 2019.  During this period, it was necessary for Steel to make at least one member loan to help keep the Company doors open.[18]

**The Transfers.**

Throughout the four years, the Company paid the Defendants a variety of recurrent payments that were booked as guaranteed compensation, variable compensation, tax payments and—in the case of Millard—consulting fees.

More particularly, during the four-year period preceding bankruptcy, meaning between January 18, 2015, through January 17, 2019, the Company paid Wiesehan guaranteed compensation totaling $751,417; Millard received guaranteed compensation of $489,167; and Justin Wiesehan received guaranteed compensation of $469,667.[19]

The Estate did not sue to avoid and recover these guaranteed compensation payments.  Rather, the Estate seeks to avoid and to recover from each Defendant, the variable compensation, tax distribution, and consulting fee payments paid to them by the Company during the four years preceding bankruptcy.  These periodic payments are numerous[20] and individually, unremarkable.  As such, we will not itemize them.

*The Transfers to Wiesehan.*  During the relevant time period, the Company made variable compensation payments to Wiesehan totaling $144,551.85 and tax distributions totaling $49,660.64.  Thus, the Estate seeks to avoid and to recover from Wiesehan, $194,212.

*Transfers to Millard.*  Similarly, in 2015-2016, the Company paid variable compensation payments to Millard totaling $137,551.85 and tax distributions totaling $37,813.65.  Millard left the

---

[18] Steel filed a secured proof of claim for $7,449,722 and an unsecured claim for $30,000.  Steel's last loan of $250,000 was made on September 29, 2017, shortly after the Defendants were terminated.
[19]Barbee Expert Report, Attachment 2.
[20]The Transfers are itemized in an Exhibit A to each Amended Complaint.

Company's employ at the end of 2016 but was then retained as a consultant.  In 2017, the Company

paid Millard consulting fees totaling $75,000.  The Estate seeks to avoid and to recover from Millard

$250,366.

*Transfers to Justin Wiesehan.*  During the relevant period, the Company paid variable

compensation payments to Justin Wiesehan totaling $140,926.47 and tax distributions totaling

$32,276.38.  Thus, the Estate seeks to avoid and to recover from Justin Wiesehan, $173,202.

The Company booked the Transfers as compensation and expensed these payments in its

accounting records.  Defendants reported all of the Transfers as partnership income on their personal

tax returns.

## DISCUSSION

Jurisdiction over this adversary proceeding lies according to 28 U.S.C.§1334.  These are

core proceedings pursuant to 28 U.S.C. § 157(b)(2).

A trustee has the burden of proving all elements necessary to avoid a Section 548 fraudulent

transfer, including the burden of establishing that the transfer was not made for fair equivalent value.

*Cooper v. Ashley Commc'ns NC, Inc. (In re Morris Commc'ns*), 914 F.2d 458, 466 (4th Cir. 1990).

"The Trustee must prove the elements of Section 548 by a preponderance of evidence."  *In re Bay*

*Vista of Va., Inc*., 428 B.R. 197, 221 (Bankr. E.D. Va. 2010).  So too a creditor asserting a North

Carolina state law fraudulent transfer.  N.C. GEN. STAT. § 39-23.4(c).  The same appears true under

the Delaware distribution statute.  6 DEL. CODE § 18-607(a); *see Triple H Family L.P. v. Neal*, 2018

Del. Ch. LEXIS 262 at *31 (Del. Ch. Apr. 19, 2018).

## a. Preliminary Motions.

*1. Defendants' Motion to Exclude Plaintiff's Expert.*

At trial, Defendants renewed their pretrial motion to exclude the expert testimony of Andy

Barbee on the topics of insolvency, capital, and reasonable executive compensation.[21]  As to the first two topics, Defendants argue Barbee failed to comply with applicable valuation standards, and his method produced a liquidation value unsuitable to the valuation of than operating company.  As to reasonable executive compensation, Defendants argue Barbee is unqualified to opine on this subject and even if he was qualified, his analysis does not factor in the scope of services that Defendants provided to the Company or their experience in the retail and e-cigarette industry.    Finally, the Defendants accuse Barbee of violating AIRA[22] standards of disinterestedness, in that he is appearing as an expert witness in an action in which he is a party.

I denied the Defendants' original exclusion motion without prejudice to it being renewed at trial.  Order Denying Defendants' Motion to Exclude Expert Testimony & Motions for Summary Judgment, Adv. No. 21-3002, Doc. 89.  Having now heard Barbee's testimony, I reaffirm that ruling.

I conclude that under the Federal Rules of Evidence Rule 702 and the associated gatekeeping standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-94 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), Barbee is qualified to testify as an expert as to all three matters, particularly in the "relaxed" context of a bench trial. *See United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013).

Barbee has substantial experience in all of these areas.  He is a Certified Public Accountant ("CPA") with 30 years of experience.  He is certified in financial forensics by the AICPA,[23] and accredited in business valuation by the same organization.   He is certified in distressed business valuation by the AIRA.  He has regularly performed insolvency, capital, and

---

[21] Defendants' Motion to Exclude Expert Testimony, Adv. No. 21-3002, Doc. 63.  Substantially identical motions were filed in all three adversary proceedings.  For clarity, this opinion will only cite to the Wiesehan docket.
[22] Association of Insolvency & Restructuring Advisors.
[23] American Institute of Certified Public Accountants.  ("AICPA").

reasonable executive compensation evaluations in bankruptcy cases.  In context of determining business values, Barbee has testified as an expert witness on numerous occasions in this and several other courts.  He has the requisite qualifications to be recognized as an expert in each of these areas, based upon education, prior professional experience, and his reliance upon industry and market information.   And most of the objections lodged by Defendants to Barbee's qualifications speak to the weight to be afforded to his expert testimony, not his suitability as an expert witness.

That said, the Defendants' last contention—that Barbee may not serve as an expert witness in his own case-- is a question of first impression in this judicial district.  Thus, it deserves explanation.

Technically, GreerWalker, LLP is acting as Liquidating Agent of the Estate.  Barbee is a partner of GreerWalker but is not a party himself.  However as a practical matter, Barbee is the only member that firm to appear on behalf of the Estate in this action or to sign pleadings on its account.  Thus, in the broader sense, Barbee is appearing here as a 1) party, 2) lay witness and 3) expert witness.[24]

Every Circuit Court to have considered this question has concluded that a party is not foreclosed from serving as an expert witness in its own case.  *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1042 (7th Cir. 1988); *Hingson v. Pac. Sw. Airlines*, 743 F.2d 1408, 1412 (9th Cir. 1984); *Brownlee v. Gay & Taylor, Inc.*, 861 F.2d 1222, 1225 (10th Cir. 1988); *Scheidt v. Klein*, 956 F.2d 963, 968 (10th Cir. 1992).  While uncommon, the discovery rules actually contemplate this situation.  The Advisory Committee Note to the Rule 26(b)(4) of the Federal Rules of Civil Procedure speaks to an expert <u>regularly employed by a party</u> not being immune from discovery

---

[24] Barbee's trial testimony was segregated between lay and expert testimony portions.

(emphasis added).  The Comment indicates that any potential bias may be explored on cross-examination and argued to the jury.  Whether the person may serve as an expert depends not on party status, but on his knowledge, skill, experience, training or education.  Fed. R. Evid. 702; *Dunn v. Sears, Roebuck & Co.*, 639 F.2d 1171, 1174 (5th Cir. 1981), *modified*, 645 F.2d 511 (5th Cir. 1981).

As to Defendants' suggestion that such service might infringe upon AIRA rules, Barbee disputes that this is so.  I need not decide that question because it is irrelevant.  The AIRA is a leading insolvency accounting organization.  Even so, expert witness qualification in federal court is based upon Rule 702, not the rules of a private association.  Barbee meets the qualification standards of the rule.  Accordingly, Barbee is qualified to testify as an expert witness on all three topics.

*2. Defendants' Motion to Exclude Evidence not produced in Discovery.*

Meanwhile, the Defendants' renewed motion to exclude certain Estate exhibits (and Barbee's testimony directly related thereto) as not having been produced in discovery is well founded.

This dispute first came up during the summary judgment stage of the case.  It relates to a Defendants' Interrogatory exploring an Estate contention that the Company had knowingly failed to accurately account for its product return liabilities.  *See* Defendant's Motion to Exclude Expert Testimony & Motions for Summary Judgment, Adv. No. 21-3002, Doc. 75.  That motion was denied without prejudice.  The objection was reasserted at trial during Barbee's direct examination by the Estate.  Having considered that motion against an evidentiary background, I conclude the Defendants' objection should be sustained.

Defendants Interrogatory #7 asked the Estate to "state all facts upon which you rely to

support your contention that the Debtor knowingly failed to accurately account for its liabilities

related to product returns throughout the duration of its business operation." *See* Defendant's

Motion to Exclude Expert Testimony, Adv. No.21-3002, Doc. 63 at p. 20. Plaintiff provided a

response that the Defendants' counsel found to be inadequate. Parrish wrote Houston to demand

that the Estate disclose the facts it relied upon when making the "allegations of accounting fraud,

including an identification of the return liabilities by customer and amount which the Debtor

believes were not properly accounted." Defendant's Notice of Filing Exhibits, Adv. No. 21-

3002, Doc. 66, Ex. N, pp. 5-6. Plaintiff's counsel acknowledged that Defendants were entitled to

this information and promised that the Estate would produce it in due time;

> "… **the information you are seeking is not simply compiled. To fully respond** to
> this interrogatory in the manner you request, **the history of the Consolidated Debtor's
> sales and returns have to be fully evaluated and reconstructed. The Liquidating
> Agent has been working for months with the Consolidated Debtor's former
> customers to identify and obtain this information**. Indeed, as of the date of this
> letter, the Plaintiff has produced copies of the source information gathered to date
> necessary for this reconstruction to you. However, **because of the complexity of the
> data involved, your questions can only be answered accurately by an expert who
> has fully analyzed the many transactions at issue**. As disclosed in the Plaintiff's
> original response, the **Plaintiff intends to engage an expert witness to provide this
> analysis and will disclose that witness's opinion** at a time and in a manner consistent
> with the Federal Rules of Bankruptcy Procedure and the Order Extending Pre-Trial
> Deadlines in this case.

*Id.* at 7-8 (emphasis added)**.** The Estate did retain an expert in this action, Barbee.

Unfortunately, Barbee did not provide this factual analysis in his Expert Report. Defendant's

Motion to Exclude Expert Testimony, 21-03002, Doc. 63, Ex. A ("Barbee Report"). In fact,

Barbee expressly disclaims making an expert evaluation of the Debtor's accounting practices.

Nor were the Estate's discovery responses supplemented to provide this information in any other

form.

However, at trial the Estate attempted to introduce testimony and documentary evidence

by Barbee to demonstrate that the Defendants knowingly created false sale returns information in the Company's books.  The documentary evidence was the Company's QuickBooks audit trail of return liabilities, Plaintiff's Exhibits 83 and 89.  Defendants renewed their objection.

The parties disagree whether such evidence must be presented through an expert witness, Defendants say it must; the Estate says that it need not.  In my opinion, Expert witness testimony is not necessarily required to attest to the accounting information to be found in the Debtor's books and records.  As Liquidating Agent, GreerWalker occupies a role akin to a bankruptcy trustee.  A trustee may, as a lay witness, authenticate a Debtor's business records.  *In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1267 (11th Cir. 2015); *see also In re Bernard L. Madoff Inv. Sec. LLC*, 830 F. App'x 669, 671 (2d Cir. 2020).

That said, and as Houston indicated in his reply correspondence to Parrish, if more complicated financial analyses were required, an expert witness was required.  And that witness' testimony must be disclosed in the expert's report.  Fed. R. Bank. P. 7026 (a)(2)(B).  This did not occur here.[25]

We need not determine the precise boundary line between expert and lay financial testimony in this case.  For the Estate told the Defendants that their interrogatory request would be answered through expert testimony and its position would be explained.  Unfortunately, it was not.

It is no answer to say that Defendants might have found this information in the audit trail documents contained in the Debtor's books and records.  The Company's accounting records were maintained in QuickBooks, an electronic format.  They are voluminous.  It would not be reasonable to ask the Defendants to anticipate and locate the precise information that the

---

[25] Given the complexity of this case, I suspect the failure to have Barbee provide expert testimony on these matters was oversight.  There is no indication of a willful failure to make discovery.

Estate might use at trial.  As to the audit trail, this would be akin to asking the Defendants to

identify a couple of needles out of a haystack full of needles.

Having failed to provide Exhibits 83 and 89 in discovery, the Estate is precluded from

using them at trial.  Further, the Barbee testimony directly relating to these documents is

excluded from the evidentiary record.

*3. Defendant's Motion to Exclude (Unpled Accounting Fraud).*

As reflected by the Defendant's interrogatory number 7, Defendants have also argued

(both at the summary judgment hearing and at trial) that the Estate is really asserting an unpled

case for accounting fraud.  They seek to exclude Barbee's expert testimony on key elements of

the Estate's legal claims: actual fraudulent intent, lack of reasonably equivalent value, and

Defendants had actual knowledge of the Debtor's purported insolvency.  According to

Defendants, there is a lack of allegations of "…particular transactions where revenues were

improperly recorded, including the names of the customers, the terms of specific transactions,

when the transactions occurred, and the approximate amount of the fraudulent transactions."

Defendant's Reply in Support of Motion for Summary Judgment, Adv. No. 21-03005, Doc. 55

at p.4.  In short, the Defendants say that the Estate is asserting an unpled claim of accounting

fraud and supporting that claim with expert testimony on a topic not covered by Barbee's expert

report.

I disagree.  The cases the Defendants rely upon are securities fraud cases and are

inapposite.  This is a bankruptcy fraudulent transfer avoidance action.  Here, the Estate was

obliged to plead and prove the elements of Section 548, its North Carolina state law counterpart,

and the Delaware distribution statute. 11 U.S.C. § 548; N.C. GEN. STAT. § 39-23.1 *et seq.*; N.C.

GEN. STAT. § 39-15; 6 DEL. CODE § 18-607(a).  A debtor's business decisions, actions, its

financial transactions, and the accuracy of its books, are very relevant to a fraudulent transfer

action. No accounting fraud claims need be pled.

Further, Defendants suggest that the Barbee testimony should be excluded because his

Expert Report states that "[he] did not perform a financial statement review . . . ." The

Defendant ignore the fact that Barbee's expert report also specifically addressed those topics:

insolvency, reasonable capitalization, etc. Barbee Report at p. 8. As an expert, Barbee was able

to rely on the information available to the Company in its books and records. And as the Estate's

representative—i.e., the successor to the Company's management—Barbee may also testify

about contents of those books and records as a lay witness. The Motion is denied.

Now, with these preliminary motions addressed, we turn to the substantive issues from

the trial.

**b. Were the transfers made to the Defendants fraudulent transfers?**

1. *Avoidance actions under the Bankruptcy code.*

Avoidance actions attacking employee compensation as fraudulent transfers are relatively

uncommon. However, compensation is not immune from attack. Section 548 specifically

references transfers made to and for the benefit of an insider under an employment contract."

11 U.S.C. § 548(a)(1).

Generally, payments of salary are presumed to have been made for fair consideration. *In*

*re TC Liquidations LLC*, 463 B.R. at 268. This rebuttable presumption makes for 'tough

sledding' by bankruptcy trustees inclined to attack employee compensation as fraudulent

transfers. For a trustee to succeed, he must either establish that 1) the compensation payments

were made in bad faith (i.e., were actual fraudulent conveyances under 548(a)(1)(A))[26] or else 2)

---

[26] Actual Fraud is further considered below. *Infra* Discussion (c).

the compensation was excessive in light of the Defendants' employment responsibilities (i.e., a constructive fraudulent conveyance under 548(a)(1)(B)).  *Id.*; *see also In re S. Textile Knitters*, 65 F. App'x. 426, 437 (4th Cir.2003); *Cilco Cement Corp. v. White*, 55 A.D.2d 668, 668, 390 N.Y.S.2d 178 (2d Dep't 1976) (salary paid to the president of the company was not a fraudulent conveyance because there was "no evidence that his salary was either excessive or unreasonable, or that the corporation did not receive full value in return."); *Mills v. Everest Reinsurance Co.*, 410 F.Supp.2d 243, 254 (S.D.N.Y. 2006);.

Under any circumstances, determining whether compensation paid to employees of a debtor corporation is avoidable as fraudulent conveyances is a difficult task.  Here, that task is made even more difficult due to 1) the Company's lack of corporate formalities and documents when it was operating and 2) the failure to preserve and retain those Company records and emails that did exist. As to the former, the Company never had any written employment, compensation, or noncompetition agreements with the Defendants.  Rather, at the end of every year, the Board would hold a meeting to evaluate and approve a plan for the Company for the following year.  According to Wiesehan, this meeting would include review and approval of compensation paid to the Company's management and employees.  It would help if we had a full set of minutes from the Board meetings, but many of these are missing.  The minutes that do exist are not detailed as to the compensation arrangements.

Additionally, in September 2017—just prior to bankruptcy—all of the Company's assets were sold.  This included its computers, and no copies or backups were Thus, emails retained. between the participants that might have supplied the needed detail about the Transfers and the participants' understanding, were lost.

*2. Constructive Fraudulent transfers under 11 U.S.C. §548a(1)b.*

Barbee testified that the Defendants' guaranteed compensation was excessive.  Rather than

contesting the degree by which that guaranteed compensation was too high and seeking recovery of the overage, the Estate chose to "spot" the Debtors their guaranteed compensation. It did not sue to recoup these sums. Instead, the Estate wishes to avoid and recover every dollar paid to the Defendants above that guaranteed compensation, whether denominated as variable compensation, tax distributions, and consulting fees. The Estate's theory is simple: If the guaranteed compensation was excessive, then the other payments were for no consideration. In the first instance, the Estate is asserting a constructive fraudulent transfer claim.

Section 548(a)(1)(B) provides in relevant:

"the trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
(IV) made such transfer to or for the benefit of an insider or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B). The North Carolina state law analog to Section 548 is substantially identical, except that it has a four-year reach back period.[27] N.C. GEN. STAT. § 39-23.1 *et seq.*

In short, to succeed on counts Two and Three of the Amended Complaints, Ballantyne Brands must establish: (a) the occurrence of one or more transfers, (b) of an interest of the Debtor in property, (c) made within four years of the petition date, (d) that the Debtor received less than reasonably equivalent value in exchange for such transfer(s), and (e) that the Debtor was either (i)

---

[27] Given the substantial overlap, we will simply refer to Section 548, but assume a four-year reach back period.

insolvent on the date(s) the transfer or transfers were made, or, (ii) engaged in business or a transaction for which any property remaining with the Debtor was an reasonably small capital.

It is undisputed that (a), (b), (c) are satisfied in each action, as to each of the Transfers. The fight is really over reasonably equivalent value and insolvency/unreasonably small capital.

> ### A. The Debtor Received Reasonably Equivalent Value for the Tax Distributions and the Consulting Fee Transfers, but not for the Variable Compensation.

The purpose of fraudulent transfer law is the preservation of the debtor's estate for the benefit of its unsecured creditors. *Harman v. First Am. Bank of Md. (In re Jeffery Bigelow Design Grp., Inc.)*, 956 F.2d 479, 484 (4th Cir. 1992) (emphasis removed) (quoting Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr. Dev. J. 55, 80 (1991)).  Accordingly, our focus is on "the consideration received by the debtor, not on the value given by the transferee." *Id.*  Thus, the question of reasonably equivalent value is essentially, "'whether, as a result of the transaction, the debtor's estate was unfairly diminished.'" *Field v. United States (In re Abatement Envtl. Res., Inc.)*, 102 F. App'x. 272, 279 (4th Cir. 2004) (quoting 1 Gerrard Glenn, *Fraudulent Conveyances and Preferences* § 275 (rev. ed. 1940)); *see also Harman v. First Am. Bank of Md.*, 956 F.2d 479 at 484.

In performing the reasonably equivalent value analysis, a court focuses on the substance of the transactions rather than their form.  5 *Collier on Bankruptcy* ¶548.03 (Matthew Bender & Co., eds., 16th ed. 2022); *accord Boyer v. Crown Stock Distribution*, 587 F.3d 787, 793 (7th Cir. 2009) (quoting Douglas G. Baird, *Elements of Bankruptcy* 153-54 (4th ed. 2006)) ("'[F]raudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights.'").

> ### B. "Value"

A two-step inquiry is employed to determine reasonably equivalent value: (1) Did the debtor receive value, and (2) was the payment reasonably equivalent to the value extended? *In re Nelco, Ltd.*, 264 B.R. 790, 813 (Bankr. E.D. Va. 1999) (citing *Mellon Bank v. Official Comm. Of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.*), 92 F.3d 139, 149 (3d Cir.1996)).

"Value" under § 548(d)(2)(A) includes "…satisfaction or securing of a present or antecedent debt of the debtor . . . ." 11 U.S.C. § 548(d)(2)(A). Payments made on account of valid antecedent debts are presumptively made for reasonably equivalent value.

As an initial matter, BB asserts that although denominated as variable compensation, tax distributions and consulting fees, the Transfers were equity distributions made to the Defendants. If true, this would resolve the reasonably equivalent value inquiry in the Estate's favor. "Dividends or other distributions to equity owners in respect of their equity interests are transfers for which the corporation or other entity receives no value." 5 Collier on Bankruptcy, ¶ 548.05[2][c]; *accord Fin. Inst. Funding, Inc. v. Off. Comm. Of Unsecured Creditors of GenFarm Ltd.*, (*In re Buncher Co*.), 229 F.3d 245, 252-53 (3d Cir. 2000).

However, the evidentiary support for the Estate's theory is limited to the fact that Defendants listed the Transfers on their individual tax returns as "partnership income." This is a weak reed on which to lean. This evidence is limited, circumstantial, and inconclusive.[28] In point of fact, the Estate cites no case to support its argument that the compensation payments must be treated as equity distributions simply because they were reported as partnership income on tax returns.

More fundamentally, the tax reporting evidence is contrary to the other stronger evidence presented at trial. The Company's books and records, the testimony given by the Defendants and

---

[28] While their individual tax returns placed the compensation in the "partnership income" category, the K-1's issued to the Defendants and filed as a part of those returns, treat the payments as compensation.

by the Steel representatives, Howard and Mario Marcon ("Marcon"), are all congruent. The participants considered the Transfers to be employee compensation payments. Thus, with one exception, I reject the Estate's suggestion that the Transfers were equity distributions.

The relatively few distributions[29] made to the Defendants to defray tax liabilities relate to the Defendants' minority equity interests in the Company. Even here, however, the facts do not bear out the Estate's "equity distribution theory."

In a typical C corporation, income is taxed twice: once, at the corporate level, then again at the shareholder level, as personal income. *See* 33 Am. Jur. 2d *Federal Taxation* ¶ 4001; *see also* 33 Am. Jur. 2d *Federal Taxation* ¶ 4002. As noted, a pass-through entity passes all of its tax attributes and liabilities to its shareholders so that tax is leveled but once. *See* 33 Am. Jur. 2d *Federal Taxation* ¶ 6358 (May 2023). Typically, this is a benefit to the business and its owners.

In a pass-through business, the individual members are taxed for the Company's income even if they did not actually receive a cash distribution. 33 Am. Jur. 2d *Federal Taxation* ¶ 6358. To alleviate this inequity, the Company's Operating Agreement obligated it to make tax distributions to its members to defray those taxes. Thus, it appears the tax distributions satisfied legal obligations owed by the Company to the Company. Meaning, the tax distributions were transfers on account of antecedent debts.

*Employee Compensation is for Value.* For Section 548 purposes, 'value' includes compensation for services rendered by employees. Steve H. Nickles*, Behavioral Effect of New Bankruptcy Law on Management and Lawyers: Collage of Recent Statutes and Cases Discouraging Chapter 11 Bankruptcy*, 59 Ark. L. Rev. 329, 353 (2006) (citing 2 Epstein, Nickles, & White, Bankr. 6-60 at § 6-49 at 23); *see also In re Fin. Federated Title & Trust, Inc.,* 309 F.3d

---

[29] Such distributions were made by the Company to all members, including the Steel entities.

1325, 1332 (11th Cir. 2002).

Here, the Defendants were employed by, and worked for, the Company. They provided 'value' to the Company. The real question is whether that value was reasonably equivalent to the compensation payments that the Defendants received?

C. "Reasonably Equivalent Value"

'Reasonably equivalent value' is not a defined term under the Bankruptcy Code. As construed by the courts, it is a flexible concept. We know that 'reasonably equivalent value' is not "wholly synonymous with market value." *Morris Commc'ns NC, Inc.,* 914 F.2d at 466. Nevertheless, "market value is an extremely important factor…used in the…assessment…" *Id.* We are further instructed that a fixed mathematical formula[s] may not be used to determine reasonable equivalence. A totality of the circumstances inquiry is required. *Id. at* 466–67.

Under a totality of the circumstances inquiry, a court considers several factors, including: (1) the good faith of the transferee; (2) the amount of discrepancy between the amount paid and fair market value; (3) the ratio or percentage of the amount paid to fair market value; and (4) whether there was an arm's length transaction between willing parties. *Id* at 467. Of these factors, there is "considerable importance" in whether the exchange was an arm's length transaction. *Id.* "A large or significant disparity between what the debtor gave and what it received in exchange typically precludes a finding that the debtor received reasonably equivalent value." *In re Tanglewood Farms, Inc. of Elizabeth City,* 487 B.R. 705, 710 (Bankr. E.D.N.C. 2013), citing 5 Collier on Bankruptcy ¶ 548.05[2][a].

Here, the Estate categorically argues that a debtor does not receive reasonably equivalent value from making pass-through tax distributions. The Estate cites to *Pryor v. Tiffen (In re TC Liquidations LLC),* 463 B.R. 257, 271 (Bankr. E.D.N.Y. 2011) (dividends paid by pass-through

entity debtor to insiders for personal tax liabilities did not provide debtor with reasonably equivalent value) and *Grigsby v. Carmell (In re Apex Automotive Warehouse, L.P.)*, 238 B.R. 758, 773 (Bankr. N.D. Ill. 1999) (tax distributions to person in control of subchapter S corporation to pay taxes on income subchapter S corporation earned did not provide value to the corporation) in support of this premise.  Conversely, Defendants categorically argue that such distributions are for reasonably equivalent value.  They cite *In re F-Squared Inv. Mgmt., LLC*, 633 B.R. 663, 677 (Bankr. D. Del. 2021) in support of their view.

In my opinion, the issue is not categorical.  Rather, the question turns on the facts presented, such as a) the nature and amount of the tax liabilities, including whether the tax distributions were attributable to the corporations profits as opposed to the member's employee compensation, b) the amount of taxes the company would have overwise paid as a C corporation (i.e. how much tax was saved because the business was taxed on a pass-through basis), c) the benefit to the corporation of the funds (on which taxes are being levied) being retained for use in the business instead of being distributed to equity, and d) whether there was a preexisting legal obligation by the debtor to pay those tax liabilities.

As to that last point, the *F-Squared* judge concluded: "[i]n the context of this case, <u>where F-Squared agreed that it would make distributions</u> on passed-through taxes as a condition to gaining acceptance from a group of shareholders for conversion to an S-Corp, I find that shareholders provided reasonably equivalent value."  *In re F-Squared Inv. Mgmt., LLC*, 633 B.R. at 677 (emphasis added).  Thus, *F-Squared* recognizes that reasonably equivalent value can be given for tax distributions IF there is a legal obligation to pay.

Here, the Estate has the burden of proof to demonstrate the lack of reasonably equivalent value.  The scant evidence presented about the tax distributions tells us almost nothing about the

tax liabilities.  All we know is reimbursement was required by the Operating Agreement.  The

Estate has not demonstrated that the tax distributions were anything other than reimbursement of

the Defendants' aliquot share of the tax liabilities attributable to the Company's profits, a liability

created under the Operating Agreement.  In this case, the Estate has failed to meet its burden.  The

tax distributions may not be avoided as constructive fraudulent transfers.

> D. The variable compensation and consulting fees received by the defendants were for less
> than reasonably equivalent value.

Turning to the variable compensation and consulting fee payments, we start with an

unremarkable premise: if compensation paid by a debtor is commensurate with the employee's

undertaking, the debtor has received reasonably equivalent value in exchange for those transfers,

and they cannot be avoided.  *See In re Auto Specialties Mfg. Co.*, 153 B.R. 457, 498 (Bankr. W.D.

Mich. 1993).

Defendants first suggest that because a 'presumption of reasonableness' applies to their

compensation, expert testimony is required to overcome it.[30]  Here, they rely on *Askanase v. Fatjo*,

No. CIV.A.H-91-3140, 1996 WL 33373364, at *9 (S.D. Tex. Apr. 1, 1996) (granting summary

judgment in favor of a defendant on fraudulent transfer claims where the court found there was no

expert witness testimony regarding the reasonableness or excessiveness of the defendant's

compensation).  As noted, Defendants first argued that Barbee was not qualified to offer expert

opinions on this topic.  But if qualified (and he was), Defendants believe Barbee's testimony to be

deeply flawed.  They argue that Barbee did not factor in the Defendants' actual job duties but

instead relied solely on an online database.  And further, Defendants say Barbee did not choose an

appropriate sample for the Debtor's industry, the e-cigarette manufacturing trade.

---

[30] It is curious that at summary judgment, the Defendants argued expert testimony as to the reasonableness (fair market value) of compensation would be necessary, but they secured no expert in the case. I suspect they could not find anyone so willing to attest.

By contrast, the Estate criticizes the Defendants as having no admissible evidence of their own as to the value of their compensation. Rather, Defendants offered only self-serving lay testimony about their job duties and the speculative value of the benefits thereof to the Debtor. The Estate acknowledges that the Defendants' testimony about what they did for the Company is competent evidence; however, it also argues that the reasonableness of the Defendants' compensation can only be determined through expert testimony. As the Estate has the only expert testimony on the topic, it should prevail.

I agree with the Defendants, the Estate must present competent evidence to overcome the reasonable compensation presumption. However, I do not think expert testimony is always required. In some circumstances, a factual showing made through lay parole testimony, documentary evidence, or both, that would suffice to establish reasonably equivalent value.[31]

In this case, that question is academic. Barbee is a qualified expert, and his testimony was much more persuasive than the Defendants' lay testimony, even if the latter were admissible. Barbee's testimony has broad market support. By contrast, the Defendants' evidence amounts to little more than their subjective evaluations of their own value to the Company and the fact that Steel was willing to pay them the compensation they received.

A subjective opinion as to one's value is hardly probative of market value. And while the Defendants' second assertion is stronger, it is not prevailing. Obviously, Steel, as a private equity firm/majority owner, had considerable business acumen and no incentive to overpay the Company's employees. Howard of Steel testified that his personal monies and those of Steel co

---

[31] For example, the Fourth Circuit has upheld a bankruptcy court's finding that the salary and bonus of the president of a corporate debtor was good faith compensation for services rendered on the strength of circumstantial evidence: the aggregate amounts paid ($250,000), the debtor's sales revenues ($13,000), and its historical profitability. *In re S. Textile Knitters*, 65 F. App'x at 433. There is no suggestion in the opinion that expert testimony was presented in that case.

owner Howard Lichtenstein funded the Company.  According to Howard, the two operated Steel with self-interest.  They did not make a practice of overpaying executives at Steel's portfolio corporations.

I take Howard at his word.  However, his testimony only demonstrates what Steel thought the Defendants' services were worth.  One data point does not establish market value.  The only reliable evidence about reasonable compensation is that provided by Barbee, which we next consider.

E. The Barbee Compensation Analysis.

The Barbee analysis looked at the Transfers received by the Defendants in several different ways.

*Aggregate Compensation*.  First, Barbee tallied up the total payments made by the Company to all three Defendants over the four years preceding the bankruptcy from January 18, 2015-January 18, 2019.  Barbee Report at 13.  In the aggregate, the Defendants received $2,328,031: $1,710,251 in guaranteed compensation (which the Estate is not attempting to recover); and $617,780 in the Transfers, the payments made to the three Defendants for variable compensation, tax distributions and/or consulting payments.

*Individual Compensation Received by the Defendants*.  Barbee then broke out the two types of payments by individual Defendant:

| **Wiesehan** | | **Millard** | | **Justin** | |
|---|---|---|---|---|---|
| Year | Guaranteed | Year | Guaranteed | Year | Guaranteed |
| 2015 | $240,000 | 2015 | $240,000 | 2015 | $120,750 |
| 2016 | 249,167 | 2016 | 249,167 | 2016 | 154,167 |
| 2017 | 262,250 | 2017 | | 2017 | 194,750 |
| **Total** | **$751,417** | **Total** | **$489,167** | **Total** | **$469,667** |

Barbee Report, Attachment 2.  To reach this conclusion, Barbee compared each Defendant's Guaranteed Compensation to that of other persons holding like positions at other industry firms

(e.g., Wiesehan's guaranteed compensation was compared to compensation paid for chief executive officers in the relevant industry and geographical area).

Barbee based his comparison on the Reasonable Compensation Reports, Inc. ("RCR") database, a publication commonly employed in the business valuation and accounting fields to gauge appropriate executive compensation levels.   Barbee Report at 14, citing Reasonable Compensation Reports, Inc.

Barbee selected the appropriate industry: Merchant wholesalers, nondurable goods industry (NAICS 424000).  He then considered reasonable compensation results for two markets, the National market and the Charlotte, North Carolina market.[32]

The RCR reports list three compensation levels for each position: Low, Recommended (Average), and High.  Barbee chose the Low level due to the Company's poor financial position: it had lost, in the aggregate, $18,081,295 million in the four fiscal years preceding the petition date.  Barbee then compared the Payments made to each Defendant to those lower tiers of the salary ranges for that industry, based upon compensation averages for both the Charlotte and National markets.

Comparing these averages to what the Defendants received in all types of payments from the Company, Barbee calculated an aggregate 'overpay' for the four-year reach back period:

| Defendant | National | Charlotte |
|---|---|---|
| John J. Wiesehan | $506,233 | $370,435 |
| Todd Millard | 515,344 | 476,515 |
| Justin Wiesehan | 394,024 | 350,996 |
| **Totals** | **$1,415,601** | **$1,197,946** |

Or, if the Transfers are excluded, and only the Guaranteed Payments made during the four years reach back period are considered, Barbee concluded that the three Defendants' <u>aggregate</u>

---

[32] Where the Company was located.

guaranteed compensation exceeded reasonable compensation levels by $797,821 (National market) or $580,166 (Charlotte market).

*Individual analysis.* Barbee next compared each individual Defendant's guaranteed compensation to reasonable compensation norms, by year:

**Wiesehan, Chief Executive Officer**

| Year | Guaranteed v. | Reasonable Compensation | |
| --- | --- | --- | --- |
| | | National | Charlotte, NC |
| 2015 | $240,000 | $158,379 | $209,324 |
| 2016 | 249,167 | 170,953 | 224,049 |
| 2017 | 262,250 | 110,065 | 141,822 |
| **Total** | **$751,417** | **$439,397** | **$575,195** |

**Millard, Chief Operating Officer**

| Year | Guaranteed v. | Reasonable Compensation | |
| --- | --- | --- | --- |
| | | National | Charlotte, NC |
| 2015 | $240,000 | $81,230 | $94,966 |
| 2016 | 249,167 | 85,799 | 101,158 |
| 2017 | | 57,159 | 66,893 |
| **Total** | **$489,167** | **$224,188** | **$263,017** |

**Justin Wiesehan**

| Year | Guaranteed v. | Reasonable Compensation | |
| --- | --- | --- | --- |
| | | National | Charlotte, NC |
| 2015 | $120,750 | $81,230 | $94,966 |
| 2016 | 154,167 | 85,799 | 101,158 |
| 2017 | 194,750 | 81,816 | 95,749 |
| **Total** | **$469,667** | **248,845** | **291,873** |

Barbee Report, Attachment 2. Barbee concluded that each Defendants' guaranteed compensation exceeded both the National and Charlotte norms for each year. Based on Barbee's analysis, the Estate maintains that the Transfers—any monies paid by the Company to the Defendants over their Guaranteed compensation during the reach back period (whether denominated as variable compensation, consulting fees, or tax distributions) were for less than reasonably equivalent value.

The next chart, a simplified version of Barbee's analysis, shows by individual Defendant

and year, the Guaranteed compensation and the Transfers, and how they stack up to industry norms:

### Wiesehan, Chief Executive Officer

| Year | Guaranteed | Reasonable Compensation | | Transfers |
| --- | --- | --- | --- | --- |
| | | National | Charlotte, NC | |
| 2015 | $240,000 | $158,379 | $209,324 | $99,246 |
| 2016 | 249,167 | 170,953 | 224,049 | 76,120 |
| 2017 | 262,250 | 110,065 | 141,822 | 18,847 |
| Total | $751,417 | $439,397 | $575,195 | $194,212 |

### Millard, Chief Operating Officer

| Year | Guaranteed | Reasonable Compensation | | Transfers |
| --- | --- | --- | --- | --- |
| | | National | Charlotte, NC | |
| 2015 | $240,000 | $81,230 | $94,966 | $99,246 |
| 2016 | 249,167 | 85,799 | 101,158 | 76,120 |
| 2017 | | 57,159 | 66,893 | 75,000 |
| Total | $489,167 | $224,188 | $263,017 | $250,366 |

### Justin Wiesehan

| Year | Guaranteed | Reasonable Compensation | | Transfers |
| --- | --- | --- | --- | --- |
| | | National | Charlotte, NC | |
| 2015 | $120,750 | $81,230 | $94,966 | $59,105 |
| 2016 | 154,167 | 85,799 | 101,158 | 96,972 |
| 2017 | 194,750 | 81,816 | 95,749 | 17,125 |
| Total | $469,667 | $248,845 | $291,873 | $173,202 |

Again, the Transfers are the sums sought to be recovered from the individual Defendants in these three adversary proceedings.[33] The Estate maintains that since guaranteed compensation exceeds reasonable levels, the Transfers were not for reasonably equivalent value.

Defendants lodge a litany of criticisms to the Barbee compensation analysis: Barbee is not qualified to opine on the reasonableness of executive compensation; he did not make an analysis himself but simply pulled information from an online database; he did not consider the scope of services that Defendants provided to the Company; the choice of business category was improper;

---

[33] Originally, the Estate sought additional payments made in 2014 under a constructive fraud theory, but that claim was dismissed.

he did not consider "travel requirements" and "key relationships and/or contracts" as stipulated by

the Reasonable Compensation Report.

Those assertions are rejected.

I have already addressed Barbee's qualifications as an expert and will not repeat them

here.

As to the analysis, Barbee was entitled to rely (which he did in part) on RCR as a key

source of comparison data:

> "[a]n expert may base an opinion on facts or data in the case that the expert has been
> made aware of or personally observed. If experts in the particular field would reasonably
> rely on those kinds of facts or data in forming an opinion on the subject, they need not be
> admissible for the opinion to be admissible."

Fed. R. Evid. 703.  RCR is a reliable database service with 50 million plus wage data points,

including IRS employment criteria, legal opinions, geographic differentiation, and industry-

specific information.  Declaration of William A. Barbee, Adv. No. 21-03002, Doc. 70 at ¶¶ 28-29.

Due to its national scope and the specificity with which executive compensation can be compared,

the RCR database is commonly relied upon by professionals in the accounting and business

appraisal fields.  *Id*.  And Barbee's approach is comparable to that employed in other bankruptcy

cases.  *See Kane & Kane v. United States*, 479 B.R. 617, 624 (Bankr. S.D. Fla. 2012).

As Barbee's testimony reflected, his review factored in the nature of the Debtor's business,

and the attributes and duties of the Defendants.  By contrast, the Defendants are not experts

themselves in executive compensation, and they produced no expert witness of their own.[34]  The

Barbee expert testimony stands as the only probative evidence presented as to the value of the

Defendant's services.  I consider Barbee's testimony to be well reasoned, supported by market

---

[34] The Defendants retained an expert to attack Barbee's report, but otherwise chose not to employ him in these
actions.

data, and reliable.  It is factually adopted.

*Plaintiff's aggregate transfer theory.*   Based upon Barbee's expert report and testimony that the guaranteed compensation paid to the Defendants exceeded both the national and local market rates for similarly situated executives, the Estate draws a legal conclusion (or perhaps an ultimate fact): even if properly considered variable compensation, tax payments and consulting payments, the Transfers were for no 'reasonably equivalent value' to the Company.

While the Barbee testimony is admissible as expert testimony under Rule 702, this Court is not obliged to accept it or the ultimate facts and legal conclusions to be drawn from it.  *See* Fed. R. Evidence 702.  Here, I find the Barbee compensation analysis to be factually sound; however, the legal conclusions which the Estate draws from that testimony as to "reasonably equivalent value" are somewhat at variance with controlling law.

The Estate lumps all of the Transfers together.  However, the Transfers sought to be recovered are of three different natures; were paid to three different individuals; and were paid over four years, not a single, unitary period.  Breaking the Transfers down further, this comes into focus:

**Wiesehan, Chief Executive Officer**

| Year | Guaranteed | Reasonable Compensation | | Transfers | Variable | Tax Dist. |
|------|------------|----------|----------|-----------|----------|-----------|
| | | National | Charlotte | | | |
| 2015 | $240,000 | $158,379 | $209,324 | $99,246 | $74,840 | $24,406 |
| 2016 | 249,167 | 170,953 | 224,049 | 76,120 | 62,711.85 | 13,407.65 |
| 2017 | 262,250 | 110,065 | 141,822 | 18,847 | 7,000 | |
| **Total** | **$751,417** | **$439,397** | **$575,195** | **$194,213** | **$144,551.85** | **$37,813.65** |

**Millard, Chief Operating Officer**

| Year | Guaranteed | R. Comp. | | Transfers | Variable | Tax | Consulting |
|------|------------|----------|----------|-----------|----------|-----|------------|
| | | National | Charlotte | | | | |
| 2015 | $240,000 | $81,230 | $94,966 | $99,246 | $74,840 | $24,406 | |
| 2016 | 249,167 | 85,799 | 101,158 | 76,120 | 62,711.85 | 13,407.65 | |
| 2017 | | 57,159 | 66,893 | 75,000 | | | 75,000 |
| Total | $489,167 | $224,1882 | $63,017 | $250,366 | $150,960.85 | $37,813.65 | $75,000 |

**Justin Wiesehan**

| Year | Guaranteed | Reasonable Compensation | | Transfers | Variable | Tax Dist. |
|------|------------|----------|----------|-----------|----------|-----------|
| | | National | Charlotte, NC | | | |
| 2015 | $120,750 | $81,230 | $94,966 | $59,105 | $46,826 | $12,278.92 |
| 2016 | 154,167 | 85,799 | 101,158 | 96,972 | 87,099.42 | 9,872,50 |
| 2017 | 194,750 | 81,816 | 95,749 | 17,125 | 7,000 | 10,124.96 |
| Total | $469,667 | $248,845 | $291,873 | $173,202 | $140,925.42 | $32,276.38 |

With these distinctions in mind, we determine reasonably equivalent value.

F. Determining Reasonably Equivalent Value based upon the Barbee Analysis.

First, for the reasons stated above, the tax distribution payments were not compensation based upon the Defendants' wages.[35] These payments defrayed tax liabilities the Defendants had incurred due to their membership interests in the Company and its pass-through tax status. Reimbursement was required by the Operating Agreement. Lacking any evidence of disparity in amount or that these sums paid other things, it appears that the tax distributions simply paid legal liabilities owed by the Company to the Defendants. These payments were for reasonably equivalent value and cannot be avoided.

---

[35] Although the minority membership interests were given as compensation. *See* Section I(a).

Second, the Estate's aggregation assumptions are legally improper.  In several parts of its analysis, the Estate treats the three Defendants as if they were but one.[36]  It tallies up all payments made to all Defendants, subtracts the low average compensation for each of their positions, and then deems the aggregate overage to be "excessive."  These cases may have been tried on a unified record; however, we have three separate Complaints seeking differing relief against three different defendants.  The reasonableness of the Defendants' compensation must be evaluated individually.  This is doubly true given that the Estate did not sue to recover the guaranteed compensation.

Similarly, the Estate improperly aggregates the compensation paid to the defendants over a period of several years.  It tallies up payments made to the Defendants (as a group and as individuals) over the four-year reach back period, subtracts the Low average compensation for those years, and deems the rest "excessive"/avoidable.  However, the Defendants were salaried employees whose compensation was set annually.  Their compensation was paid in recurrent, usually monthly, payments.  On the facts presented, we cannot lump compensation paid to an employee over a period of years and demand repayment of the excess.  The excessive compensation calculation must be made on an annual basis.

Third, Millard's 2017 payments pertain to his work as a consultant, not to the compensation he previously garnered as a full-time employee in 2015-2016.  Millard's role and his payment arrangement changed in 2017.  These consulting fees may or may not be excessive, but they stand or fall on their own merit.  They cannot be lumped together with the salary compensation paid to Millard in earlier years.

Fourth, and most importantly, the Estate is equating "reasonably equivalent value" with "Low" average compensation of employees within the relevant industry.  Essentially, the Estate's

---

[36] In fairness, later, the Estate breaks out the Transfers individually.

position is that if an employee is paid more than low average pay for his job in his industry, <u>to that</u> <u>extent</u>, the transfer is excessive and avoidable.  Such a conclusion would appear contrary to the Fourth Circuit's twin mandates in *Morris Communications:* (1) reasonably equivalent value cannot be automatically assumed to be fair market value, and (2) it can't be determined by rote mathematical calculation. 914 F.2d at 466.  Above average compensation is not necessarily for less than reasonably equivalent value, excessive compensation is.

Fair market value is the starting point of the reasonably equivalent value analysis.  And we must consider a Defendant's guaranteed compensation together with the variable compensation he received for the given year.  But the operative term here is "reasonably equivalent value," not "precisely equivalent value."

Against that backdrop, I will use Barbee's analysis to provide a 'totality of the circumstances' evaluation of the Variable Compensation paid to the individual Defendants.  The Millard Consulting Fee payments will then be considered separately.

There is an initial question of whether to employ the "National" average or the "Charlotte, NC" average.  Barbee offered both numbers, but since I must determine the degree to which officer compensation was excessive, it is a matter of choosing one or the other.  Here, the National average is lower (at all levels) than the Charlotte average.  However, the Company was physically located in Charlotte.  To give the words "reasonably equivalent value" their due meaning, I will compare the compensation paid to these employees to the marketplace in which the Debtor was located.  In short, I will employ the Charlotte market averages.

The RCR Reports Barbee employed contain a range of reasonable compensation—Low, Recommended (average), and High.  Importantly, the RCR Reports expressly state that any wage within the three suggested ranges is acceptable and is within a 90% confidence level.  *See e.g.*,

Defendant's Note of Filing Exhibits, Adv. No. 21-03002, Doc. 66, Ex. Y.  Unfortunately, Barbee presented only the RCR Low range numbers in his chart.  The Court was not supplied with the corresponding Recommended (average) or High numbers.

Meanwhile, the Defendants provided the full RCR report for CEO's like Wiesehan in 2016, showing all three ranges, Low, Recommended and High.  Defendant's Note of Filing Exhibits, Adv. No. 21-03002, Doc. 66, Ex. Y.  However, they didn't supply those reports for 2015 and 2017.  Similarly, the Defendants provided a 2017 RCR report applicable to managers like Millard and Justin Wiesehan, but no reports for 2015 and 2016.  *See* Defendant's Note of Filing Exhibits, Adv. No. 21-03002, Doc. 66, Ex. Z.[37]

Given this deficiency, as to Wiesehan, I will employ the 2016 RCR salary ranges for the Recommended and High reasonable compensation for all three years.  I make the same assumption as to Millard and Justin Wiesehan—but here I will employ 2017 compensation levels.[38]  Any difference should be nonmaterial given the short (3 year) time period and given that the task is to determine "reasonable," and not precise, value equivalency.

Even with that buffer, it is clear that each Defendant's guaranteed compensation was higher than every relevant reasonable salary range.  But guaranteed compensation is not at issue, and the Estate may not recover it indirectly.  So how do we determine the degree of excess of the Defendants' variable compensation (and Millard's consulting fees), without turning "reasonably equivalent value into "exact low average industry pay"?  Precision is impossible, but logically a cushion must be afforded.

To provide that needed cushion, we will employ the RCR reports and simply upgrade to a

---

[37] The Recommended and High tiers are important to provide a buffer so as to avoid converting "reasonable equivalent value" into a hard "Low" average compensation cap.
[38] Fortunately, the available figures are for the middle year, so any discrepancy is likely to be nominal.

higher pay level. Instead of the using Low range, we will employ the High range of the scale. This is higher than what Barbee considered necessary. Legally, however, choosing the top end of the scale affords us a needed cushion. Moreover, as the RCR Reports state, doing so is factually defensible as the RCR Reports indicate that any wage within the suggested range is acceptable and is within a 90% confidence level. *See e.g.*, Defendant's Note of Filing Exhibits, Adv. No. 21-03002, Doc. 66, Ex. Y. Of course, the implication behind that statement is that any compensation paid beyond the High level would be excessive. Meaning, it would not be for reasonably equivalent value.

Employing the High end of the RCR range at Charlotte compensation levels, yields these results:

*Wiesehan.* For Wiesehan the "High" salary in the Charlotte marketplace would have been $285,170.

In 2015, he received guaranteed compensation of $240,000 plus variable compensation payments of $74,840, for a total of $314,840. Giving him the benefit of the cushion, Wiesehan's total 2015 compensation was excessive by at least $29,670.

Similarly, in 2016, Wiesehan received guaranteed salary of $249,167 and variable compensation payments of $62,711.85, for total 2016 compensation of $311,878.85. Giving him the cushion, Wiesehan's total 2016 compensation was excessive by at least $26,708.85.

Finally, in the partial year, 2017, and after proration,[39] the High salary for Wiesehan in the Charlotte marketplace would have been $199,228. He received guaranteed compensation of $262,250 and variable compensation payments of $7,000, for total 2017 compensation of $269,250. Giving him the cushion, Wiesehan's 2017 compensation was excessive by $70,022.

---

[39] Defendants were terminated in early September 2017, so Barbee prorated the 2017 year based upon 255 of 365 days, or 70 % of the year.

In sum, over the four-year reach back period, Wiesehan received excessive compensation of at least $126,400.85.[40]   Of this, $63,378.85[41] of the variable compensation payments made to him were for less than reasonably equivalent value.

*Millard.*   For Millard, the High salary in the Charlotte marketplace would have been $122,090.

In 2015, he received guaranteed compensation of $240,000 plus variable compensation of $74,840, for a total of $314,840.  Giving him the cushion, Millard's total 2015 compensation was excessive by at least $192,750.

In 2016, Millard received guaranteed compensation of $249,167 and variable compensation payments of $62,711.85, for a total of $311,878.85.  Giving him the cushion, Millard's total 2016 compensation was excessive by at least $189,788.85.

Millard was no longer an employee in 2017.

In sum, over the four-year reach back period, Millard received excessive compensation of at least $382,538.85.[42]  Of this, $137,551.85[43] in variable compensation payments made to him were made for less than reasonably equivalent value.

*Justin Wiesehan.*   For Justin Wiesehan the High salary in the Charlotte marketplace would also have been $122,090.  In 2015, he received guaranteed compensation of $120,750 and variable compensation of $46,826, for a total of $167,576.  Giving him the cushion, Justin Wiesehan's total 2015 compensation was excessive by at least $45,486.

In 2016, Justin, Wiesehan received guaranteed compensation of $154,167 and variable compensation of $87,099.42, for a total of $241,266.42.   Giving him the cushion, Justin

---

[40] $29,670 + $26,708.85 + $70,022.
[41] $29,670 + $26,708.85 + $7,000.
[42] $192,750 + $189,788.85.
[43] $74,840 + $62,711.85.

Wiesehan's total 2016 compensation was excessive at least by $119,176.42.

And in the partial year, 2017, after proration,[44] the suggested salary for Justin Wiesehan in the Charlotte marketplace would have been $85,296.  He received guaranteed compensation of $194,750 and variable compensation of $7,000, for a total of $201,750.  Giving him the cushion, Justin Wiesehan's total 2017 compensation exceeded high industry norms at least by $116,454.

In sum, over the four-year reach back period Justin Wiesehan received excessive compensation of at least $281,116.42.[45]  Of this, $139,585.42[46] in variable compensation payments made to him were made for less than reasonably equivalent value.

*Millard's Consulting Compensation.*  After leaving the Company's employ at the end of 2016, Millard worked as a paid consultant in 2017.  He was paid a total of $75,000 for his services.  There is no written consulting agreement between Millard and the Company.  On the other hand, it appears the Board was aware of this arrangement and did not object.  None the less, the Estate contends that Millard was overpaid.

To determine reasonable compensation for these consulting payments, Barbee used the same methodology as he employed to determine reasonable guaranteed compensation.  Specifically, he "compared the [Millard consulting payments] to the lower tier of the reasonable compensation salary ranges for the Charlotte and national market since the [Debtor] reported an aggregate net loss of $18,081,295 . . . ."  Barbee Report at 14.  He then pro-rated Millard's compensation in 2017 over 255 (of 365) days, the consultancy period.  Barbee Report, Attachment 2, n. 7.  From that, Barbee deduced that reasonable compensation for Millard as a consultant during 2017 would have been $66,893.  Even so, based upon its theory that Millard's aggregate

---

[44] Based upon 255 out of the 365 days of the year.
[45] $45,486 + $119,176.42 + $116,454.
[46] $45,486 + $87,099.42 + $7,000.

guaranteed compensation was excessive for the four-year period, the Estate seeks to avoid and to recover the entire $75,000.

Once again, I do not entirely agree with the Estate's application of the facts to the law. Again, the Estate did not sue to avoid the guaranteed compensation payments, so it cannot recover any overage of guaranteed compensation. As previously discussed, we cannot collapse the years. The analysis is done on a year-by-year basis. Doing so would be improper even if the $75,000 represented employee compensation. However, in 2017, Millard was no longer an employee of the Company. He was a consultant, an independent contractor.

We have no evidence of what Millard should command as an independent contractor. Barbee equated him to a salaried employee. Even if we treated Millard as a salaried employee, under Barbee's low average analysis, reasonable compensation would have been $66,893. The difference between that and what Millard was paid is only $6,689.62. As Millard points out, if one takes the RCR Reports, Inc. data on which Barbee relied, substitutes the "Suggested" (average) compensation paid for a chief operating officer in the Charlotte market for the "Low" range, and then pro-rates that sum, a $81,689.62 reasonable compensation number is obtained.[47] Millard was only paid $75,000.

For the reasons previously stated, use of the low average is appropriate for a business like the Company. However, for "reasonably equivalent value" purposes, a cushion must be added. When it is, it becomes clear that Millard was not overpaid for his consulting work. The Consulting fees were for reasonably equivalent value.

G. Insolvency.

Under section 548(a)(2), a constructive fraudulent transfer also requires a finding of

---

[47] The "High" range would yield an even larger figure.

insolvency at the time of the transfer(s).  11 U.S.C. § 548(a)(2).  A court determines insolvency by employing a balance sheet test: a debtor is insolvent when its total debts are greater than the sum of its assets.  *Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62, 74 (Bankr. W.D.N.C. 2002).  An entity is "insolvent" under the Bankruptcy Code when "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation."  11 U.S.C. § 101(32)(A); s*ee also* N.C. GEN. STAT. § 39-23.2(a) (containing a nearly identical definition).

A "debt," in turn, is a "liability on a claim." 11 U.S.C. § 101(12).  And a "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5)(A).  Thus, a court must consider any "right to payment, whether or not such right is reduced to judgment" in its evaluation of a company's solvency. *Id.*

Barbee's expert testimony was based upon an analysis of the Debtor's financial data (including but not limited to its trial balances, general ledger, and internal financial statements), audited financial statements prepared by third-party accounting firms, customer sales and return records, and interviews with the company's largest equity owner.  That testimony demonstrated that the Company's liabilities exceeded the fair market value of its assets at all pertinent times:

- The Debtor experienced negative net income beginning in 2014;

- The Debtor operated at annual net losses ranging from $1.8 million to $11.8 million between fiscal years 2014 to 2018;

- The Debtor's aggregate net losses from 2015 to 2018 totaled over $18 million;

- Although the Debtor reported positive income in 2016, it also suffered negative equity of $4 million as of December 31, 2016;

- The Debtor's net sales decreased from approximately $30 million in 2014, to $3.4 million in 2018;

- While the Debtor's net sales decreased during the years in which the Transfers

incurred, its product discounts as a percentage of sale increased from 8.10% in 2013, to 74.68% in 2017 and 53.96% in 2018;

- The Debtor's financial statements reported a members' equity deficit of $1,880,935 in the quarter prior to the first Transfers in April of 2015, and this deficit steadily grew to $17.8 million by 2018; and

- Even without making any discounts to the reported value of the Debtor's assets in the relevant years, its liabilities exceeded the value of its assets by a low of $1.8 million in 2015, to a high of $17.8 million in 2018.

Further, the Debtor was named in a series of lawsuits over sales commissions, sales promotions, breaches of contract, returns of unsold product, and patent infringement based upon transactions occurring during the Transfer period. Those suits represent a large part of the $28 million of claims filed against this Estate. Purposefully inaccurate or not, the Debtor's assets were inflated in its financial reporting, casting significant doubts on the asset values reported in its financial statements. Its liabilities were misstated. But, even without adjusting for these inaccuracies, the Debtor was consistently insolvent during the times each Transfer was made to the Defendants.

Defendants make two primary arguments in opposition to insolvency. First, they suggest that the Barbee expert report and his testimony are unreliable due to a flawed methodology. Second, they suggest, that most of the Transfers occurred in 2016, a year in which the Debtor ostensibly posted a $3.8 million profit. To the same point, the Defendants cite the 2017 Strategic Plan to suggest that the Company was then worth at least $25-30 million. They say that value is supported by the contemporaneous sale of competitor NJOY for an asserted $65 million.

In sum, Defendants maintain that the Company was solvent as long as they ran it. They say it was killed by several Steel-inflicted wounds: the decision to forego FDA approval, their termination, and the decision to move the Company into online retailing. Defendants further assert that as long as the Company kept selling product to the large retailers like Walmart, its product return liabilities would have been repaid in the ordinary course. Defendants also suggest that the move to

online marketing occasioned the accrual of these mammoth liabilities.

There is no doubt that ending the big box retailing arrangements in favor of online sales made the Debtor's financial plight worse.  Otherwise, the evidence simply doesn't support the Defendants' contentions.

First, the valuation methodologies which Defendants' rebuttal expert Justin Boyd says Barbee should have applied—IRS Revenue Ruling 59-60 and the AICPA Standards for Valuation Services (the "AICPA Standards")—are themselves inapplicable to a bankruptcy fraudulent transfer insolvency valuation.  *See* Rev. Rul. 59-60, 1959-1 C.B. 237.  The Barbee valuation is not flawed in this respect.

Second, Barbee explained at length the Adjusted Asset method he employed and why it was best suited to evaluate solvency in the Debtor's factual situation.  Barbee specifically refuted the contention that his methodology produced an improper liquidation valuation or otherwise unfairly reduced asset values.  Rather, Barbee's valuation was performed based upon the assumption of a going concern.[48]  And as noted above, Barbee's experience in such matters is lengthy, his methodology was sound, and his recognition as an expert was warranted.

As to Defendants suggestion that the Company was solvent through 2016, the time periods when most of the Transfers occurred, the evidence clearly shows otherwise.  By early 2014, the Company was insolvent, and it remained insolvent thereafter.  The Transfers began in early 2015.

The $5 million net profit which management reported in the 2016 financials was overstated; a major known expense (the Walmart slotting fees) of almost $5 million was reversed and removed from the 2016 financials.[49]  But even if correctly stated, the alleged 2016 net profit would have been insufficient to make the Company solvent.

---

[48]Defendants could have asked their own expert to perform a solvency analysis, but they did not offer the same. Thus, one wonders whether Boyd would have come to a different conclusion than Barbee.

[49] While I excluded Exhibits 83 and 89 relating to the unanswered Defendants' Interrogatory 7, the other evidence presented at trial confirmed that this in fact happened.

By contrast, the Defendants' personal testimony as to solvency was largely inadmissible as improper speculation and lay opinion. Even if admissible, the probative value of that testimony was minimal. So too was the Defendants' circumstantial evidence of solvency: the 2017 Strategic Plan and the NJOY sale. The Defendants rely on the 2017 Strategic Plan to suggest a $25-30 million quick sale value of the Company. However, this document was prepared by Management. Further, while replete with "blue sky" prognostication, it is not founded on any appraisals, business valuations, or other objective evidence. Additionally, these prognostications ignore several serious negative circumstances: the overstatement of 2016 Net Income due to underestimating discount and return liabilities and the need to fund FDA compliance costs. Finally, the 2017 Strategic Plan projected unrealistically high 2017 revenues ($30.2 million) and net income ($1.9 million).

As to the NJOY sale, that transaction was factually distinguishable. As Barbee attested, the Company lacked the major assets which NJOY possessed (physical plants, intellectual property, etc.). Significantly, the NJOY sale was not a cash sale to a disinterested purchaser, it was a bankruptcy Section 363(k) credit bid by an existing secured creditor.[50]

On the record presented, the Company was consistently insolvent from 2014 forward, and certainly insolvent on the Transfer dates.

*4. The Debtor Possessed Unreasonably Small Capital at the Time of the Transfers.*

Section 548 also recognizes that a transfer is avoidable if it occurs when the transferor was "engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital." 11 U.S.C. § 548(a)(1)(B)(ii)(II); *accord* N.C. GEN. STAT. § 39-23.4(a)(2) (referring to "unreasonably small assets"). "Unreasonably small capital" has been defined as "a financial condition short of equitable

---

[50] With all of its resources, the NJOY backup bid was only $2.3 million cash.

insolvency," or "technically solvent but doomed to fail." *Friedman v. Am. Capital, Ltd. (In re Barton-Cotton, Inc.)*, No. 11-00079, 2012 Bankr. LEXIS 3114, at *19 (Bankr. D. Md. July 10, 2012) (quoting *Off. Comm. Of Unsecured Creditors of Norstan Apparel Shops, Inc. v. Lattman* (*In re Norstan Apparel Shops Inc.*), 367 B.R. 68, 79 (Bankr. E.D.N.Y. 2007).

To determine whether a debtor is undercapitalized (or retains unreasonably small assets), courts look to whether the debtor has an 'inability to generate sufficient profits to sustain operations . . . ." *Smith v. Litchford & Christopher, P.A. (In re Bay Vista of VA., Inc.)*, 428 B.R. 197, 225 (Bankr. E.D. Va. 2010)). "Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses." *Moody v. Security Pac, Business Credit*, 971 F.2d 1056, 1073 (3d Cir. 1992).

As of March 31, 2015—approximately two weeks before the Transfers began—the Company reported a negative net worth of approximately ($1.8 million). This deficit only increased in succeeding years, increasing to ($3.8 million) in 2016[51] and ultimately reaching ($15.6 million) in 2017. These increasing deficits are reliable indicators that the Company was not operating profitably and was unable to cover its expenses.

Reinforcing these indicators, the Estate presented expert evidence via Barbee that the Debtor's available net working capital as a percentage of sales was drastically lower than applicable industry averages during the same period. In fact, that ratio was a <u>negative number</u> in all years except 2016. Barbee Report at 12.

The circumstantial evidence supports the Estate's assertion that the Company lacked adequate capital. The Minutes of the April 27, 2015, board meeting reference the 2014 audit losses and a serious lack of accounting controls. The minutes mention meetings about pending

---

[51] This, without inclusion of the $4.9 million reclassification of the Walmart slotting fee obligation.

litigation—previously referenced above—and speak of employee layoffs. These are not indications of a company possessing reasonable levels of operating capital.

The Defendants attempt to refute these objective facts by pointing to Steel's April 2016 written commitment to backstop the Company, the availability of cash funds when the Defendants received the Transfers, and the fact that the Company continued in operation for eighteen months after the last compensation payment was made to Defendant.

Defendants have painted the Steel (DCS Services II, LLC) April 2106 funding commitment as reaffirmation of the latter's "commitment to the Company and its belief in the Company's prospects." Defendant's Motion for Summary Judgment, Adv. No. 21-03002, Doc. 62. It is anything but that. The Steel funding commitment was a necessary response to the Company's auditors' prior statement to the Board that the Company could not be categorized as a "going concern." Thus, the Steel letter is a testament to the Company's nonviability and not an endorsement of the adequacy of its capitalization. It should be noted that even as given, the Steel commitment was for the shortest possible period, 13 months (just clearing the upcoming fiscal year).

Moreover, the Steel letter wasn't working capital, it was bare promise from an external source. We measure working capital and viability by reference to the debtor's own resources, not those of a separate company. Here, the Company did not possess sufficient resources of its own to continue and it did not receive them in April 2016 from Steel.

Even if Steel advanced monies to the Debtor, such shareholder loans would not have increased the Debtor's capitalization. As Barbee pointed out, such a loan would have increased the Company's assets; however, it would have also caused a corresponding increase of liabilities. Of course, if contributed as additional capital, the promised funds would have improved the

Company's viability.  However, there is no evidence of such an intention by Steel.  As Steel's proof of claim reflects, from early on, Steel's provision of funds to the Company took the form of member loans, and secured ones, at that.  Given the Company's acute financial distress, it is inconceivable that anyone would have contributed additional equity at this point in time.

As of mid 2016, all knew that the Company would require millions of additional capital in order to secure FDA approval.  By this point, Steel's willingness to inject more money into the Debtor was waning.  In fact, within the thirteen months promised by the commitment letter, Steel would discard the FDA approval initiative, effectively giving up on the Company.

The Defendants' also point to the Company's 2016 audited financial statements which reflect cash availability of $2.4 million in January 2017, the date of the last variable compensation payment.  This, they say demonstrates that the Company had the necessary capital to sustain operations.  I reject that assertion.  Again, the Company was operating at a loss and was dependent on member loans.  To the extent that the Company had any available cash, it was because it was not paying all of its bills.[52]  The Company did not have enough capital to go forward.

The Defendants also make much of Barbee's testimony that at this point the Company would have required annual net income of $4 million to $5 million in order to sustain operations. Pointing to the reported 2016 Income Statement, the Defendants assert that the Company had this capability.  Again, I am not persuaded.  The last-minute reversal by Management of the Walmart slotting fees and their decision to move that expense into 2017 signifies the 2016 net income figure as substantially overstated.  Even if accurate, this was, at best, a single profitable year after two substantially unprofitable years, during a time in which the Company's sales (adjusted for sales returns) were nosediving.

---

[52] At the time, the Company had $7 million of booked liabilities and a large amount of disputed, but potential, liabilities.

The Defendants also cite the 2017 Strategic Plan as evidence of the Company's viability and substantial value. It cannot bear such weight. The 2017 Strategic Plan is an aspirational document, not a financial statement or an appraisal. It is quite long on unbridled optimism and very short on objective data. Putting that aside, the 2017 Strategic Plan itself acknowledges that the Company had "restricted working capital." Declaration of William A. Barbee, Adv. No. 21-03002, Doc. 70, ¶¶24-25; Declaration of John J. Wiesehan, Adv. No. 21-03002, Doc. 64, Ex. L at 15. And in actuality, the Debtor's actual performance was even weaker than it appeared, due to the underestimation of discount and return liabilities. Barbee Report at 11. Finally, there was a looming iceberg in the water: the $5-7 million estimated cost to obtain FDA approval of the Company's products, without which the Company would be unable to sell its goods. At this point, the Company had no ability to fund an expense of this magnitude. It was wholly dependent upon Steel to pay these costs. In the end, the foundation of the Defendants' contentions of solvency and adequate working capital are simply this: "We hoped Steel would give us the money." Unfortunately, hope is not capital.

The truth of the Company's financial circumstances in 2017 comes right from the mouth of the new Company CFO:

> "All arrows point to this is an unsustainable business...I've never seen such a poor run business. The fact that we are open (for now) is why I'm an optimist, because I'm shocked we've made it this far. I could write an essay on what we are doing wrong, but that's not why I'm here."

Barbee Report at 13. Whether based on its own internal data, by comparison to other industry firms, by the testimony of one of the participants, or simply as indicated by the concurrent circumstantial evidence, it is clear the Company lacked sufficient capitalization on the dates that the Transfers were made.

*Constructive Fraudulent Conveyance Summary.* To recap, on this record we can conclude

that the Tax Distributions were payments on account of antecedent debts and were reasonably equivalent value. They are not avoidable. Second, even if considered the equivalent of employee compensation, the Millard Consulting Fee payments fall within the flexible parameters of "reasonably equivalent value;" they too, are not avoidable. On the other hand, a portion of each Defendants' Variable Compensation payments was clearly excessive and thus not for "reasonably equivalent value:" $69,631 as to Wiesehan; $137,551.85 as to Millard; and $139,585.42 for Justin Wiesehan. Additionally, because the other elements of a constructive fraudulent transfers are satisfied under Section 548(a)(1)(B) of the Bankruptcy Code and sections 39-23.4(a)(2) & 39-23.5(a) of the North Carolina Uniform Fraudulent Transfer Act, the Variable Compensation Transfers are avoided as constructively fraudulent.

### c. Were the transfers actually fraudulent?

Alternatively, the Bankruptcy Code and North Carolina law allow a trustee to avoid a transfer of the debtor's interest in property made within two years of the bankruptcy petition, if the transfer was made "with actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A); *see also* N.C. GEN. STAT. § 39-23.4(a)(1). If the requisite intent is established, the transfer is avoidable without regard to whether creditors were actually harmed. *Tavenner v. Smoot*, 257 F.3d 401, 407 (4th Cir. 2001).

As before, there is no dispute that the Transfers represent payments of the Company's property. The only question posed is whether the Transfers were made by the Company "with an actual intent to hinder, delay or defraud" creditors.

Debtors rarely admit to transferring property with bad intentions. Typically, a plaintiff asserting an actual fraudulent conveyance claim must demonstrate fraudulent intent inferentially. This is done by demonstrating the existence of various "badges of fraud." *Whitaker v. Mortgage*

*Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. at 70.  Such "badges of fraud" include:

1) whether the transfer was to an insider;
2) whether the debtor retained possession or control of the property after the transfer;
3) whether the transfer was concealed;
4) whether litigation was pending or threatened against the debtor at the time of the transfer;
5) a transfer of substantially all of the debtor's assets;
6) absconding by the debtor;
7) removal or concealment of assets;
8) reasonably equivalent value in exchange for the transfer;
9) insolvency at the time of the transfer;
10) the proximity in time of the transfer to the incurrence of a substantial debt; and
11) a transfer of substantial business assets to a lienor followed by a subsequent transfer of such assets to an insider of the debtor.

*Id.* at 70 n.1.  A single badge of fraud "can warrant a court's conclusion that a transfer was fraudulently made . . . ." *Zanderman, Inc. v. Sandoval (In re Sandoval)*, No. 96-2391, 1998 U.S. App. LEXIS 18559, at *6 (4th Cir. 1998). However, the badges are not necessarily determinative, actual fraudulent intent requires a subjective evaluation of the debtor's motives. *In re Jeffrey Bigelow Design Grp., Inc.*, 956 F.2d 479, 484 (4th Cir. 1992).

What badges are present here?  Frankly, it is a mixed bag.  Certainly, insider status.  The Defendants were officers, and one a board member, of the Company.  From our analysis above, insolvency.  Also, a lack of reasonably equivalent value for a portion of the Variable Compensation payments but excluding the Tax Distributions and Consulting Fees.

In regard to litigation, pending or threatened, that is a tossup.  As Defendants note, only one lawsuit was pending when the challenged transfers were made.  However, the underlying transactions that would spawn tens of millions of dollars of litigation claims had already occurred.

However, it is notable that other badges are absent.  The transfers were not concealed, rather, the payments were booked by the Company.  The Debtor did not retain the property (the payments), post transfer.  No transfer was made of substantially all the debtor's assets, these were

relatively smaller sums.  There was no absconding with property, no removal, and no concealment

of assets.  Nor was there a proximity of the transfers to the incurrence of a single, substantial debt.

Rather, these payments were made throughout the Debtor's existence.

In Section 548 litigation, the burden of proof is on the trustee.  Even so, transfers made to

insiders without adequate consideration give rise to a presumption of actual fraudulent intent.

*Tannever v. Smoot*, 257 F.3d at 408 (citations omitted).  The *Tannever* presumption applies to the

variable compensation payments, and it establishes a prima facie case of fraudulent intent.  It falls

to the Defendants to show otherwise.

Overall, we already know what happened and generally, why.  Here, we will consider three

specific Estate assertions of actions by the Defendants which allegedly demonstrate actual

fraudulent intent.

*1. Changing the method by which Defendants were compensated.*

The Estate says the Defendants deprived the Board of its proper role in setting

compensation policies for the Debtor's employees, including themselves.  Based upon the

testimony of Macron, the Estate notes that in July of 2015, the Board decided to end the practice

of making variable compensation payments to Management.  However, Management continued to

pay themselves variable compensation throughout 2016.  *See* Declaration of William A. Barbee,

Adv. No. 21-03002, Doc. 70, ¶¶ 36-38.  Then, in 2017—and supposedly without informing the

Board—Management ended variable compensation payments and rolled those payments up into

their guaranteed payments.  Plaintiff's Trial Brief, Adv. No. 21-03004, Doc. No. 100, at 6.

This is an instance where the Company's failure to preserve emails makes for uncertainty.

The Board minutes are quite cursory and, as noted, we don't have them for all of the meetings.

Clearly, the idea to end variable compensation and go entirely to guaranteed compensation had

been on the table for some time.  This change was discussed at the Board meeting on July 13, 2015.  In that meeting, Jack Howard of Steel mused that although variable compensation had served a purpose, perhaps it had run its course.  There was a discussion of whether to do away with variable compensation immediately.  However, this shift appeared to be more trouble than it was worth, because the Board decided to make the change at the beginning of 2016.  Thus, the conversion to fully guaranteed compensation was agreed to and not a concealed or unilateral act by the defendants.

The record does not explain the year's delay in effectuating that change.  While the Estate cites this as Management intentionally manipulating their pay, nothing about the delay suggests such an intention.  Nor does the Estate explain why the change was intended to hinder, delay, or defraud the Company's creditors.  It would appear to simply be a change in method compensating employees.

It does appear that in 2017 the overall compensation levels for Wiesehan and Justin Wiesehan increased over 2015 levels.  This is, of course, relevant to the Estate's constructive fraudulent transfer theory.  However, apart from the increase, there is nothing in the record to suggest actual fraud.  Ultimately, the fact that this compensation change was discussed and approved at a Board meeting makes the Estate's suggestion that the Defendants did this with ill intent, most unlikely.

For actual fraudulent transfer purposes, the evidence is too weak for the theory to be adopted.

*2. The Estate's contention that Defendants "cooked the books."*

The Estate also accuses the Defendants of fraudulently overstating the Company's profitability in its non-audited financial reports in order to enrich themselves at the expense of

creditors.   The Estate suggests two different ways that Management did so: 1) the 2016

reclassification of the $4.9 million Walmart reslotting expense, and 2) the Company's practice of

over shipping product to customers, ie., 'stuffing the channel.'

### A. Reclassification of the Slotting Fees from 2016 to 2017.

Walmart originally agreed to roll out a new program in late 2016 that would have generated

significant additional sales of the Company's products.   In anticipation of that program, the

Company sold the product to Walmart, shipped the goods, and received payment for them.   Upon

making that sale, the Company booked a corresponding $4.9 million liability and recognized an

expense for "slotting fees."

In late 2016, Walmart decided to defer the program until 2017.   On December 31, 2016,

approximately two weeks before the next Board meeting, Management reversed the accounting

entries, removing the $4.9 million slotting fee expense from the Company's income statement.

Thus, the financials provided by Management to the Board at the January 18, 2017, meeting

overstated income (and likely the Company's equity position) by almost $5 million.   The Estate

maintains the Defendants did this in order to inflate the Debtor's 2016 financial performance and,

implicitly, to enable them to receive variable compensation to which they were not entitled.

We know the slotting fee accounting entry reversal/deferral occurred.   However, it is far

from clear that the Defendants engineered this transaction to mislead the Defendants or to line

their pockets.

As to the evidence presented, Howard, a participant at the Board meetings and a person

who "tried to keep informed about the Company's operations" could recall almost nothing about

these matters.   Steel's CFO, Marcon, who originally made the evidentiary accusations in his

summary judgment declaration, attempted to support them with his testimony.   However, Marcon

was hired by Steel in January 2017 and was not a participant in these events. Marcon's testimony amounted to him attesting to statements supposedly made by an unidentified outside auditor to an unidentified person affiliated with the Debtor, that were then conveyed to another unidentified person at Steel. Such triple hearsay testimony is inadmissible. Meanwhile, the Estate attempted to support its 'slotting fee' allegations with the Company's QuickBooks audit trail records and the related testimony given by Barbee. As noted above, these exhibits and testimony were excluded because they were not disclosed in discovery.

From the Defendants' side, Wiesehan testified that the Company reversed its accounting recognition of the Walmart slotting fee liabilities and deferred them to 2017 upon instruction of the outside auditors because the Walmart program was delayed until 2017. Again, the auditors' alleged instructions are inadmissible hearsay.[53] However, Wiesehan also testified that Steel was aware of these liabilities and accounting changes, and that it approved of them. His statements are self-serving, but they are clear, admissible testimony[54] that was not refuted by Howard.

Between the magnitude of the transaction ($4.9 million), the importance of the customer (Walmart), and the unusual circumstances presented (reversing and removing a large liability from the current year accounting), it is difficult to accept that Steel wouldn't have known about this transaction. I must agree with the Defendants that it defies common sense to think that the outside accountants would not have investigated a transaction of this size. Thus, on the evidence presented, the Wiesehan account prevails. No actual fraudulent intent can be deduced from this event.

B. 'Stuffing the Channel.'

The Estate's third allegation is that Defendants were "stuffing the channel" by intentionally

---

[53] It is disappointing that neither side deposed the accountants to see what they recalled about these events.
[54] Steel was present at trial. Both Howard and Marcon were questioned about these matters.

shipping more product to customers than they could reasonably sell. Based upon Marcon's testimony, the Estate suggests that Defendants oversold product to disguise the Debtor's poor financial performance. This supposedly occurred, by booking outsized sales without accounting for the resulting return liabilities that the Company would face when, per its sales agreements, the excess product was returned to them by these large retailers. According to the Estate, the net effect of this practice in 2016 was to overstate net income by 1.5 million dollars. Again, the contention was based upon the testimony of Steel's CFO Marcon, who was looking retrospectively at the transaction.

Defendants deny any such activities. Wiesehan testified that the Company based its estimate of product return liabilities based on historical performance. And as Defendants note, the Company's books were audited every year by an independent accounting firm.[55] They say if the Company had been "stuffing the channel," doubtless, this would have been noted in the audit. It was not. Moreover, Steel would have been aware of the fact.

We know the Company experienced ever-increasing levels of product returns over its brief lifespan. It is also true that Marcon began asking questions about the return liabilities in April 2017. He was unable to obtain satisfactory answers from the Company's CFO and Wiesehan.

There are at least two alternate explanations for the excessive product returns. First, as the Estate suggests, the Defendants may have intentionally caused the Company to ship more product to customers than they could reasonably expect to be sold. If so, and because Defendants' compensation was calculated upon those sales, arguably they increased their own compensation.

The other alternate explanation is that customers purchased the amount of product they thought they could sell, and the Company shipped it. When that product didn't sell as expected,

---

[55]Save for 2017.

the customers returned it.  Under their repurchase agreements, the Company was obliged to take the unsold product back and (theoretically) refund the Customer its money.

The business sophistication of the customers in question (Walmart, Rite Aid, etc.) makes it unlikely that they could be manipulated into purchasing and paying for more product than they reasonably thought they could sell.  Second, it is difficult to imagine that the Defendants could have sustained such deception from these retail giants for any appreciable period of time.

Further, the Company auditors, Cherry Bekaert and Holland looked into returns in 2016.  The auditors found reasonable return allowances were provided in the books.  It also seems farfetched to think the Defendants could keep such a practice from the auditors and Steel.  It could have happened, but the evidence to support the theory is very weak; it consists almost entirely of the product returns themselves and the after-the-fact suspicions of a nonparticipant, Marcon.

Thus, the second explanation is the better supported one.  The Company was selling a new product (e cigarettes), in a new, uncertain, and rapidly changing marketplace.  Over a period of time, the Company introduced new products which might, or might not, be well received by customers.  Over time, it faced increasing competition from larger, better-heeled manufacturers with superior marketing powers (i.e., the tobacco companies, included).  Given the choice, the most likely explanation for the increasing levels of product returns is the second and simplest: the e-cigarettes just didn't sell.  No fraudulent intent is evidenced here.

*3. Paying themselves, and not other creditors.*

Finally, the Estate accuses the Defendants of paying themselves when the Company was not paying its other creditors.  This is true.  However, as mentioned: Steel was involved and informed, the Defendants were employees, and the tax distributions and compensation were both

legal and valid corporate debts.  Paying valid compensation debts in preference to others is not

actionable because those transfers are beyond the relevant 1-year reach back period.[56]  Finally, the

Estate has not asserted a breach of fiduciary duty claim against the Defendants.

The Transfers were paid in the ordinary course, from 2013-2017.  The Defendants worked

for the Company and were entitled to receive reasonable compensation for their labor.  It appears

that Defendants believed that their compensation was reasonable, and it appears the Board (Steel)

agreed.  The Transfers were not concealed.  The Company did not transfer property to the

Defendants on the eve of bankruptcy, the prototypical actual fraudulent transfer.  There is no

indication that anyone attempted to hinder, delay or defraud any creditor.

Ultimately, I do not agree with the Defendants about the reasonable level of their

compensation.  However, that fact alone doesn't support charges of actual fraudulent intention.

In sum, the evidence presented refutes the presumption that the Transfers were made

with an actual intent by the Company to hinder, delay, or defraud creditors.  The Estate is not

entitled to avoid and recover the Transfers from the Defendants under Section 548(a)(1)(A).

*4. 11 U.S.C. § 550*

Section 550 of the Bankruptcy Code defines the parties who are liable for an avoided transfer

and allows a trustee to recover fraudulent transfers from the initial transferee, the entity for whose

benefit the transfer was made, or any immediate or mediate transferee of an initial transferee.  11

U.S.C. § 550(a).  The initial transferee is the first entity that has "exercised legal dominion and

control over the property."  *Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Props.

Ltd. P'ship)*, 99 F.3d 151, 156 (4th Cir. 1996).  In the case of a monetary transfer, the initial transferee

is the first party with "the right to put the money to one's own purposes."  *Bonded Fin. Servs., Inc.*

---

[56] One year under Code Section 547(b)(4) and N.C. GEN. STAT. § 39-23.9.

*v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988).

The Defendants are the payees and, undisputedly, the initial transferees of the Transfers. Initial transferees are strictly liable for the transfer received, even without any wrongdoing on their behalf.  *See Rupp v. Markgraf*, 95 F.3d 936, 944 (10th Cir. 1996).  To the extent that the variable compensation payments were not for reasonably equivalent value, their value must be returned to the bankruptcy estate for the benefit of the Debtor's creditors.

### d. Which transfers are recoverable under Delaware law?

Plaintiff's claim under the Delaware Limited Liability Company Act is largely duplicative of its fraudulent transfer claims.  These claims succeed and fail to the same extent.  The Estate may recover a portion of the Defendants' variable compensation, but not the tax distributions and consulting payments.[57]

Delaware statutory law prohibits an LLC from making "a distribution to a member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited liability company . . . exceed the fair value of the assets of the limited liability company . . . ." 6 DEL. CODE § 18-607(a).  Any member who receives such a prohibited distribution with knowledge that it violates the statute is liable to the company for the amount of the distribution. *Id*. at § 18-607(b).

To recover an unlawful distribution under Delaware law, a plaintiff must prove that a member of the limited liability company received a distribution, and that the member knew of the company's insolvency when the distribution was made.  *See In re Extended Stay, Inc.*, No. 09-13764-JLG, 2020 Bankr. LEXIS 2128, at *331 (Bankr.S.D.N.Y. Aug. 8, 2020).  The statute

---

[57] The primary distinction between these causes is that the Delaware statutory reach back period is only three years, as opposed to the four years permitted by the North Carolina fraudulent transfer law.  6 DEL. CODE § 18-607(c); N.C. GEN. STAT. 39-21.4(c).  Here, only those Transfers made on or after January 15, 2016, would be subject to recovery under the Delaware distribution statute.

exempts any amounts paid for "reasonable compensation" from the definition of "distribution." 6 DEL. CODE § 18-607(a).

Defendants make three arguments in opposition to this claim. First, Defendants say that to the extent that the variable compensation and consulting fee payments <u>did not</u> exceed reasonable compensation, they are not recoverable. I agree with their statement. However, the Variable Compensation Payments were excessive, and to that extent, they were not reasonable compensation. They are potentially recoverable.

Defendants next argue that the Company was not insolvent when compensation was paid to them, nor did they have actual knowledge of insolvency. However, as discussed above, the evidence shows the Company was, in fact, insolvent throughout the transfer period and that it experienced deepening insolvency as time went on. Given their positions as senior Management and in Wiesehan's case, a Board member, Defendants' knowledge of the Debtor's insolvency can be reasonably inferred.

Finally, Defendants argue that the Delaware statute requires a showing that the distribution caused the Company to become insolvent. That may be true if the corporation's financial solvency was debatable. Here, however, the Company was insolvent before, during, and after the times of the compensation. In this context, it would be nonsensical and contrary to the purpose of the statute to suggest that to be recoverable, the payments need be the precipitating event of insolvency. For a business that is already insolvent, excessive executive compensation is just as damaging to the concern and its creditors.

## CONCLUSION

In sum, the evidence suggests an outcome somewhere between both party's positions. Defendants as employees were entitled to reasonable compensation for their services and

reimbursement for the tax liabilities they incurred due to the Company's pass-through tax status.

Millard was entitled to the consulting fees which he received in 2017.  Apart from that, between

guaranteed compensation and variable payments, each of the Defendants was substantially

overpaid for his work.  Given that we are looking for reasonable—not exact—equivalence, it can

be safely said that Wiesehan received avoidable transfers[58] of at least $63,378.85; Millard, the

same to the extent of $137,551.85; and Justin Wiesehan, to the extent of $139,585.42.  To this

extent, Judgments will enter in favor of the Estate.  The remainder of the Estate's claims fail and

are dismissed with prejudice.

This Order has been signed                                    United States Bankruptcy Court
electronically. The Judge's
signature and Court's seal
appear at the top of the Order.

---

[58] Federal and state fraudulent transfers, as well as under the Delaware distribution statute